Robert FRANKLIN, et al., Appellees,

v.

**DISTRICT OF COLUMBIA, Appellant.**

No. 97–7162.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 9, 1998.

Decided Dec. 29, 1998.

James C. McKay, Jr., Assistant Corporation Counsel, argued the cause for appellant. With him on the briefs were John M. Ferren, Corporation Counsel, and Charles L. Reischel, Deputy Corporation Counsel.

Kenneth W. Brothers argued the cause for appellees. With him on the brief was Jona-

than M. Smith. John J. Rosenthal entered an appearance.

Before: SILBERMAN, HENDERSON, and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

Spanish-speaking prisoners incarcerated in the District of Columbia's eight correctional institutions brought a class action claiming violations of the First, Fifth, and Eighth Amendments to the Constitution, federal statutes (42 U.S.C. § 2000bb; 42 U.S.C. § 2000(d)), and local law. They alleged that some class members were deficient in the English language and that the District had failed to provide qualified interpreters to these inmates when they appeared at parole and disciplinary hearings and when they sought medical care. The district court ruled in favor of the prisoners on their Fifth and Eighth Amendment claims, and the District brought this appeal.

I

There are 9,000 inmates in the prisons of the District of Columbia. The inmates speak dozens of languages; members of the prison staff are fluent in a total of forty-seven languages. Of the 188 Spanish-speaking prisoners within the plaintiff class,[1] 150 had only a limited proficiency in English. To meet the needs of these and other prisoners who had difficulty communicating or understanding English, the District hired Laura Colon in November 1991 as the "Limited English–Proficient Program" coordinator. Under her aegis, the Program provided comprehensive orientation, diagnostic, mental health, vocational and language training for "Limited English–Proficient" prisoners. At the time of trial, the District required such prisoners to attend "English as a Second Language" classes and offered twenty-seven other programs either conducted in Spanish or specifically tailored for the plaintiff class. The prison system also employed seventy-two Spanish-speaking employees, including two case managers, two psychologists, and one psychiatrist. If bilingual staff or interpreters were unavailable, District officials could use the AT&T "Language Line," a service providing certified translators in 140 languages.

After a bench trial, the district court—on April 16, 1997—dismissed most of the prisoners' claims but held that the District was violating the Fifth and Eighth Amendments. Three months later, on July 8, 1997, the court issued a sixteen-page injunctive order mandating sweeping changes in the way the District operates its prisons. The District then filed a motion to alter or amend the judgment and for a new trial. The court denied the motion and this appeal followed.

II

■ The first question concerns our appellate jurisdiction. On April 17, 1997, one day after the district court rendered its decision on liability, the clerk of the court entered the judgment. The prisoners think this opened the thirty-day window for the District to file a notice of appeal, see Fed. R.App. P. 4(a)(1). The District missed the deadline and, so the prisoners claim, we cannot hear the appeal insofar as it attacks the April decision finding the District in violation of the Fifth and Eighth Amendments.

■ Our appellate jurisdiction extends to "final decisions" of district courts. 28 U.S.C. § 1291. A final decision is one that "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." Catlin v. United States, 324 U.S. 229, 233, 65 S.Ct. 631, 89 L.Ed. 911 (1945). In damage and injunction actions, a final judgment in a plaintiff's favor declares not only liability but also the consequences of liability—what, if anything, the defendants must do as a result. See Liberty Mut. Ins. Co. v. Wetzel, 424 U.S. 737, 742, 96 S.Ct. 1202, 47 L.Ed.2d 435 (1976); see also Gilda Marx, Inc. v. Wildwood Exercise, Inc., 85 F.3d 675, 677 (D.C.Cir.1996).

The order entered on April 17 established the District's liability, but it granted no relief, it imposed no obligations on the District, it did not say, as final decisions in such cases

---

1. The district court certified a class consisting of "all inmates of Hispanic origin who are now or who will later be incarcerated in the D.C. Department of Corrections institutions." Order of Dec. 13, 1995, at 19.

must, "who is entitled to what from whom." *Horn v. Transcon Lines, Inc.*, 898 F.2d 589, 591 (7th Cir.1990). It therefore was not a final judgment subject to appeal. An order like the one entered in April, "adjudging liability but leaving the quantum of relief still to be determined has been a classic example of non-finality and non-appealability from the time of Chief Justice Marshall to our own." *Taylor v. Board of Educ.*, 288 F.2d 600, 602 (2d Cir.1961) (Friendly, J.).

The antitrust case of *Brown Shoe Co. v. United States*, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962), does not, as the prisoners suppose, alter this analysis. The district court in *Brown Shoe* disposed of the entire complaint, passed on every prayer for relief, ordered full divestiture, and permanently enjoined the defendants from acquiring any interest in each other. *See Brown Shoe Co.*, 370 U.S. at 308, 82 S.Ct. 1502. The Supreme Court said: "The single provision of that judgment by which its finality may be questioned is the one requiring appellant to propose in the immediate future a plan for carrying into effect the court's order of divestiture." *Id.* That lone provision did not render the order nonfinal, the Court held, because the judgment had decided the consequences of liability—namely, full divestiture. *See id.* Here, by contrast, the April judgment did not address the consequences of the District's liability. In this respect it resembled the order in *Liberty Mutual Insurance Co.*, an employment discrimination case in which plaintiffs received a favorable ruling on the issue of liability, but received none of the relief expressly sought in their complaint. *See* 424 U.S. at 742, 96 S.Ct. 1202. "They requested an injunction, but did not get one; they requested damages, but were not awarded any; they requested attorneys' fees, but received none." *Id.* Because—as in this case—the district court had not yet finally disposed of any of plaintiffs' prayers for relief, the Supreme Court held that the district court's order was not a final decision. *See id.*

The general rule is that a party is entitled to a single appeal, to be deferred until final disposition of the case. *See McLish v. Roff*, 141 U.S. 661, 665–66, 12 S.Ct. 118, 35 L.Ed. 893 (1891); *see also Catlin*, 324 U.S. at 234, 65 S.Ct. 631; *Luxton v.*

*North River Bridge Co.*, 147 U.S. 337, 341, 13 S.Ct. 356, 37 L.Ed. 194 (1893); *Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 868, 114 S.Ct. 1992, 128 L.Ed.2d 842 (1994). To hold that defendants in injunction actions must immediately appeal orders finding only that they are liable would further erode the long-standing policy against piecemeal litigation. The final judgment rule is already riddled with exceptions: orders granting or denying preliminary injunctions may be taken up immediately; some collateral orders may be appealed; rulings on controlling issues of law may be certified for appeal; orders adjudicating the claims of fewer than all the parties may be appealable, if the district court acts pursuant to Rule 54(b), FED.R.CIV.P.; and Congress has given the Supreme Court rulemaking authority to allow other interlocutory appeals, 28 U.S.C. § 1292(e). There are good reasons why none of the recognized "exceptions" fits the district court's April order. As here, courts often resolve questions of liability first and questions of relief later. To allow an initial appeal challenging the finding of liability followed by a second appeal challenging the relief would frequently transform one appellate case into two. Delays at the trial level would become common, as district courts awaited appellate decisions on liability. For their part, the courts of appeals would often need to master the same record twice, and render two opinions instead of one. *See* 15A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 3907 (1992). Furthermore, if defendants had to wait until the remedy came down, they might decide not to appeal despite the earlier decisions holding them liable. The relief ordered may turn out to be nominal. The parties may settle. In these events, and others, forcing an appeal at the liability stage without waiting for the consequences of liability to become final would lead to unnecessary appellate litigation. For all these reasons, the April 17 order was not an appealable final decision of the district court.

Still, the prisoners insist that the April order must be considered final and appealable because the district court issued it separately and the clerk of the court entered it on the docket, as Rules 58 and 79(a) of the

Federal Rules of Civil Procedure required. While a properly entered separate judgment is an indicium of finality, *see Diamond v. McKenzie*, 770 F.2d 225, 229 n. 9 (D.C.Cir. 1985), it is not conclusive. The district court in *Liberty Mutual Insurance Co.* described its liability order as a "final judgment," 424 U.S. at 741, 96 S.Ct. 1202, yet the Supreme Court treated it as a non-appealable interlocutory order. When appellate jurisdiction is at stake, what matters is the appellate court's assessment of finality, not the district court's or the clerk's. A non-final order cannot be appealed even if the district court designates it a "final judgment" and the clerk of the court enters it as such on the civil docket.

■ For purposes of our appellate jurisdiction under 28 U.S.C. § 1291, the final decision of the district court came down on July 8, 1997, not April 17. Only in the July 8 order did the district court set forth the terms of the injunction and thereby instruct the District what steps to take. Within ten business days of July 8, the District moved to alter or amend the judgment or for a new trial. *See* FED.R.CIV.P. 52(b), 59. This had the effect of tolling the time for filing a notice of appeal. *See* FED. R.APP. P. 4(a)(4); *Derrington–Bey v. District of Columbia Dep't of Corrections*, 39 F.3d 1224, 1225 (D.C.Cir.1994); *United States v. Haynes*, 158 F.3d 1327, 1329–31 (D.C.Cir.1998). On August 27, 1997, the district court denied the motion. Because the District noted its appeal 29 days later (on September 25), within the 30 days provided in Rule 4(a)(1), FED. R.APP. P., its appeal was timely and we have appellate jurisdiction to review not only the injunction but also the judgment finding the District liable for violating the Constitution.[2] When "an appeal is taken from a truly final judgment that ends the litigation, earlier rulings generally can be reviewed." 15A WRIGHT ET AL., *supra*, § 3905.1.

■ The District's July 22 motion properly sought relief from the July 8 injunctive order. Rule 7(b)(1) requires that motions state with particularity the grounds therefore and the relief sought. *See* FED.R.CIV.P.

7(b)(1). The prisoners argue that the District's July 22 motion for a new trial or to amend the judgment "was devoted solely to attacking the April 16 judgment" and, for this reason, could not have tolled the time for noting an appeal from the July 8 injunction order. There are three mistakes embodied in the prisoners' argument. First, they are wrong that the District's motion attacking the court's liability decision did not attack the injunction. The motion necessarily had that effect. Without liability there would be no basis for injunctive relief. Second, the prisoners neglect to mention that the District's motion expressly challenged the terms of the July 8 order. *See* July 22 Motion at 1, 2. The motion took issue with specific findings contained only in the July 8 order. The District's 30–page memorandum, filed with its motion, amplified the District's concerns about the nature of the injunction. The motions in *Riley v. Northwestern Bell Tel. Co.*, 1 F.3d 725 (8th Cir.1993); and *Martinez v. Trainor*, 556 F.2d 818 (7th Cir.1977), which the prisoners cite, were of a different sort. In both of those cases, appellants filed curt, one paragraph motions, which clearly failed to comply with Rule 7(b)(1). Third, even if the District's motion had attacked only the April liability finding, its motion still would have tolled the time for appealing from the final judgment—the judgment, that is, rendered on July 8. Under Rule 59(b) and (e), FED.R.CIV.P., motions for new trials and motions to alter or amend the judgment "shall be filed no later than 10 days after entry of the judgment." The term "judgment" means an order or a decree "from which an appeal lies." FED.R.CIV.P. 54(a); *see Derrington–Bey*, 39 F.3d at 1226. The District properly filed its Rule 59 motion after the final judgment came down. And when that judgment came down on July 8, the District could attack—indeed, could limit its attack—to the earlier non-final ruling of liability on which the injunction rested. A motion so limited, like a Rule 59 motion directed only at the nature of the relief, tolls the time for noting an appeal from the final judgment. *See Derrington–Bey*, 39 F.3d at 1225–26.

---

**2.** The outcome would not change if we viewed the July 8 order as not in compliance with the "separate document" requirement of Federal

Rule of Civil Procedure 58. *See Pack v. Burns Int'l Sec. Serv.*, 130 F.3d 1071, 1072 (D.C.Cir. 1997); *Haynes*, 158 F.3d at 1329–31.

## III

On the merits,[3] we will start with the portion of the district court's decision adjudging the District liable for violating the prisoners' Fifth Amendment due process rights. These violations are said to occur at hearings in which the District fails to provide official interpreters to Spanish-speaking prisoners who have limited ability in English.

The Fifth Amendment states that no "person shall ... be deprived of life, liberty, or property, without due process of law...." When neither life nor property is involved, courts—speaking in a sort of shorthand—talk of the need to find a "liberty interest" before considering what process is due under the Fifth Amendment (or the Fourteenth Amendment). See, e.g., Wolff v. McDonnell, 418 U.S. 539, 556–58, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); see also Sandin v. Conner, 515 U.S. 472, 474, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). This is another way of saying that unless an individual is threatened with losing "liberty" within the Fifth Amendment's meaning, it is of no constitutional moment whether the individual will receive "due process of law."

Prisoners, of course, have already lost liberty by virtue of their confinement. For the Due Process Clause to govern state action against an inmate, more than the usual constraints of prison itself must be in the offing. The Supreme Court put it this way: for a liberty interest to exist, the state must be subjecting the prisoner to a "restraint" that "imposes atypical and significant hardship" as compared with "the ordinary incidents of prison life." Sandin, 515 U.S. at 484, 115 S.Ct. 2293. Only then may it be said that a prisoner is threatened with a loss of "liberty" within the Constitution's meaning. Sandin discarded the method of analysis employed in Hewitt v. Helms, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), which had made the existence of a prisoner's liberty

interest—at least with respect to matters concerning the conditions of confinement and the management of the prison—turn on whether statutes and regulations concerning the state's action contained mandatory or discretionary directives. Our opinion in Ellis v. District of Columbia, 84 F.3d 1413, 1417–20 (D.C.Cir.1996), analyzed Sandin and related Supreme Court decisions, not with regard to prison management, but in the context of parole eligibility determinations. Ellis held that local Board of Parole regulations governing parole determinations for District prisoners did not create a liberty interest. See 84 F.3d at 1420. Our earlier decision in Price v. Barry, 53 F.3d 369 (D.C.Cir.1995), held the same with respect to the local statute regarding parole. And the Supreme Court held in Greenholtz v. Nebraska Penal Inmates, 442 U.S. 1, 9–11, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979), that a liberty interest in parole cannot be derived from the Constitution itself.

Without taking account of Ellis or Price, or of Greenholtz, the district court determined that although plaintiffs "may have no liberty interest in parole per se ... that is not to say that inmates can be deprived of a fair hearing once the District of Columbia determines that a hearing will be held." And to the district court, a "fair hearing" meant the prisoners must have official interpreters to help them understand the proceedings. On this reasoning the court ordered the District's Board of Parole to coordinate with the Department of Corrections, and implement a procedure for providing official interpreters at parole hearings for all Spanish-speaking prisoners who are deficient in English.

Although the reasoning in the court's conclusions of law dealt only with parole eligibility hearings, the injunction issued several months later went considerably further. In a sweeping decree, the court ordered the District to provide interpreters at "all stages of the disciplinary, classification, housing, ad-

---

3. The District seeks a new trial on the basis that the district court acted unreasonably and arbitrarily in limiting the District's trial time. Trial courts possess considerable discretion in this area. See, e.g., United States v. Tilghman, 134 F.3d 414, 416 (D.C.Cir.1998); Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 609 (3d Cir.1995). Although the court confined the District to fifteen hours of trial time, the prison-

ers—who carried the burden of proof—labored under the same constraint. Both sides received advance notice of the conditions and both sides received ample opportunity to submit evidence into the record before trial. We could order a new trial if the District suffered a substantial injustice, FED.R.CIV P. 61, but this record will not sustain any such claim.

justment and parole hearing process," and to "implement a procedure to ensure" translation into Spanish of "documents . . . related to due process hearings. . . ." So far as we can tell, the "adjustment" "hearing process" refers to proceedings to decide whether discipline shall be imposed on an inmate. *See* D.C. Mun. Regs. tit. 28, § 508; *Sandin,* 515 U.S. at 475, 115 S.Ct. 2293. Exactly what the court had in mind by "classification" hearings is less clear. In its legal analysis of the prisoners' due process claims, the court does not even mention "classification" hearings. The court's factual findings discuss only a "preparole classification hearing." The injunction's coverage of "housing" decisions—which we take to mean judgments by prison officials about where a prisoner will be confined—also does not seem to flow from the court's legal analysis. The court's conclusions of law nowhere even mention the subject of prison housing.

As best we can determine, the court included matters other than parole eligibility in its decree solely on the basis of its reasoning—quoted above—that regardless whether a prisoner has a liberty interest, if the District decides to have a hearing dealing with these subjects the Due Process Clause governs the proceedings. We will discuss in a moment why this reasoning is mistaken, but first we must address questions of mootness and standing.

### A

■ Before we heard argument, a new law took effect, transferring to the United States Parole Commission "the jurisdiction and authority of the Board of Parole of the District of Columbia to grant and deny parole, and to impose conditions upon an order of parole, in the case of any imprisoned felon who is eligible for parole or reparole under the District of Columbia Code." National Capital Revitalization and Self–Government Improvement Act of 1997, Pub.L. No. 105–33, § 11231(a)(1), 111 Stat. 712, 745 (effective not later than one year after date of enactment, Aug. 5, 1997) ("Revitalization Act").

Why neither of the parties, and why especially the District of Columbia never alerted us to this statute is beyond comprehension. The Revitalization Act ends this case so far as parole hearings for felons are concerned.

It was the District, through its Board of Parole, that was allegedly depriving inmates of due process, and it was the District's responsibility, through the Board of Parole, to implement the court's directive that "interpreters and translated documents are provided at parole hearings." But according to the terms of the Revitalization Act, after August 1998 the Board of Parole no longer had jurisdiction to conduct parole eligibility hearings for the District's felon inmates. The United States Parole Commission, which the Revitalization Act directed to start performing this function, was not a party to this case; there was no evidence about how it conducts proceedings; there was no finding that it violates due process; it is not subject to the injunction; and for all we know, its procedural guidelines differ from the Board of Parole's. In short, § 11231(a)(1) of the National Capital Revitalization and Self–Government Improvement Act renders moot plaintiffs' claims concerning parole hearings before the local Board of Parole, at least with respect to class members imprisoned for felonies. *See, e.g., United States v. Munsingwear, Inc.,* 340 U.S. 36, 71 S.Ct. 104, 95 L.Ed. 36 (1950).

However, given the breadth of the certified class—"all inmates of Hispanic origin who are now or who will later be incarcerated in the D.C. Department of Corrections institutions," *see supra* note 1—it is possible that some members of this class are or will be imprisoned for misdemeanors, that is, for committing offenses punishable by imprisonment for one year or less. *See United States v. Budd,* 23 F.3d 442, 447 (D.C.Cir.1994); *Stephens v. United States,* 271 F.2d 832, 833 n. 1 (D.C.Cir.1959). This possibility raises two questions, one dealing with mootness and the other with standing.

As to mootness, § 11231(a)(3) of the Revitalization Act directs the Superior Court of the District of Columbia—not the United States Parole Commission—to assume the "jurisdiction and authority of the Board of Parole of the District of Columbia to grant, deny, and revoke parole, and to impose and modify conditions of parole, with respect to misdemeanants." It is not, however, apparent when this transfer of jurisdiction is to occur. The Revitalization Act directs the Superior Court to take over on the date

when the District of Columbia Offender Supervision, Defender, and Courts Services Agency ("Agency") "is established under section 11233." Revitalization Act § 11231(a)(3). Section 11233 states that this Agency "is established within the executive branch of the Federal Government" and that it "shall assume[ ] its duties not less than one year or more than three years after the enactment of this Act" (August 5, 1997). Another provision of the Revitalization Act abolishes the Board of Parole on the date the Agency "is established under section 11233." Revitalization Act § 11231(b). Both events—transfer to the Superior Court and abolition of the Board of Parole—hold the potential for mooting claims concerning parole hearings before the Board of Parole for members of the class who are misdemeanants. But, it may be that neither event has yet occurred.

■ The second question is, as we said, one of standing. In *Lewis v. Casey,* 518 U.S. 343, 357, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996), the Court held that in order to establish standing, "named plaintiffs" in a class action claiming inadequacies in a prison system must prove that they have been personally injured; beyond the pleading stage, it is not enough that some other, unidentified member of the class suffered harm from the inadequacy. As this case now stands, it is not enough that some unidentified class members suffered or will suffer injuries stemming from the manner in which the Board of Parole conducts parole hearings. If the Board of Parole is still functioning, its jurisdiction is restricted to parole for misdemeanants. In order for plaintiffs to have constitutional standing to challenge how those hearings are conducted, there must be proof that a named member of the class: (1) was imprisoned for a misdemeanor; (2) could not speak or understand English; (3) appeared before the Board of Parole seeking early release on parole; and (4) suffered harm because of the Board's failure to provide an interpreter. The district court made no findings with respect to whether plaintiffs had established these essential elements of standing.[4] We have therefore reviewed the trial record. *See Humane Society v. Babbitt,* 46 F.3d 93, 96 (D.C.Cir.1995). Five inmates gave live testimony. *Franklin,* 960 F.Supp. at 399. Of these, three were serving time for committing felonies (Lazo, Bonilla, Nunez); the remaining two (Sandoval, Mejia) offered no testimony about parole hearings.[5] The district court also considered the depositions of ten other inmates who were members of the class. *Id.* at 399–400 n. 5. Of these, eight were incarcerated for felonies (Ramos, Artola, Benavides, Grande, Maldanado, Lugo, Suazo, Vilche); one (Gaviria) said nothing about parole; and the remaining inmate (Redman) reads and writes both English and Spanish and serves as a librarian in the prison law library.[6] Under *Lewis,* then, plaintiffs have not established actual injury. *See* 518 U.S. at 358, 116 S.Ct. 2174 (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). They failed to prove that a named member of the class was a misdemeanant who went before the Board of Parole and did not understand the proceedings because of lack of proficiency in English.

With respect to parole, therefore, the court's judgment must be vacated, for mootness with respect to felons seeking parole, and for lack of standing with respect to misdemeanants seeking parole.

**B**

■ As to the remaining portion of the judgment dealing with due process and hear-

4. The district court gave only one concrete example of a member of the plaintiff class who was allegedly harmed in the context of parole because of his inability to speak English. *Franklin v. District of Columbia,* 960 F.Supp. 394, 418–20 (D.D.C.1997). The individual—José Ramos—apparently had been released by the time of the trial. *Id.* at 399–400 n. 5. His deposition shows that he was imprisoned for committing a felony, not a misdemeanor. In any event his evidence dealt only with a "preparole" proceeding conducted by prison officials at "Modular." *Id.* at

418. Modular was closed in November 1995, *id.* at 400 n. 10; and the court found that "each institution uses different procedures in determining who will receive translation services." *Id.* at 420.

5. It is not clear whether these two prisoners were convicted for felonies.

6. It is uncertain whether Gaviria and Redman were felons.

ings, we do not take issue with the proposition that when liberty interests are at stake, the Due Process Clause gives prisoners certain procedural rights, including the right to obtain an understanding of the proceedings. *See Wolff,* 418 U.S. at 570, 94 S.Ct. 2963; Henry J. Friendly, *Some Kind of Hearing,* 123 U. Pa. L.Rev. 1267, 1280–83 (1975). But are liberty interests at stake in housing determinations, in classification hearings, and in disciplinary proceedings? The district court never directly addressed the subject. If it had, the court would have learned from *Sandin* that, at least with respect to discipline, the answer depends on the nature of the discipline to which the prisoner may be subjected, and the sentence the prisoner is serving. *See* 515 U.S. at 485–87, 115 S.Ct. 2293. For instance, the 30–day disciplinary segregation imposed on prisoner Conner, although "punitive," did not "present a dramatic departure from the basic conditions" of his particular sentence, and hence did not confer a liberty interest entitling him to the "procedural protections set forth in *Wolff* [, 418 U.S. at 566, 94 S.Ct. 2963]." 515 U.S. at 485, 487, 115 S.Ct. 2293. It follows from *Sandin* that treating all disciplinary hearings alike, as the district court did here, is improper. To repeat, whether a prisoner's "liberty" is threatened—that is, whether the Due Process Clause applies—depends on the discipline involved and nature of the prisoner's term of incarceration.

■ As we have said, the district court seemed to think that although the Constitu-

tion did not necessarily require the District to hold disciplinary hearings, if the District does so, the Due Process Clause governs the proceedings. This is the equivalent of saying that District rules, regulations and guidelines, which contemplate hearings, create a due process liberty interest. *Sandin* firmly rejected that methodology. *See* 515 U.S. at 480–84, 115 S.Ct. 2293; *see also Ellis,* 84 F.3d at 1417–18. After *Sandin,* there must be a prisoner- and discipline-specific inquiry. Yet nowhere in the district court's legal analysis or in its factual findings is there any indication that the court considered what sentences the plaintiffs were serving or what discipline they were facing. The court therefore could not have compared the severity of the disciplinary sanctions to which these plaintiffs were subjected with the "ordinary incidents" of any particular plaintiff's confinement. *Sandin,* 515 U.S. at 484, 115 S.Ct. 2293. In fact, a reading of the district court's liability opinion reveals not a single incident of a due process violation, let alone "widespread" violations warranting the sort of "systemwide relief" the court ordered. *Lewis,* 518 U.S. at 359, 116 S.Ct. 2174.[7] Because the court's injunction required official interpreters and translations to be provided to *all* English deficient Spanish-speaking prisoners at *all* disciplinary and adjustment board hearings, it cannot stand.

■ Much of what we have just written applies equally to the other nonparole hearings encompassed within the court's injunction. Housing determinations and classification decisions[8] do not give rise to liberty

7. In its findings of fact the court discussed adjustment board hearings in which the inmates' attorney, who was fluent in Spanish and English, served as an interpreter for them; and a "pre-parole classification hearing" in which one inmate acted as an interpreter for another. The court seemed to suggest, although it did not outright say so, that the District violated the Due Process Clause because someone other than an official interpreter acted for these Spanish-speaking prisoners. This conclusion could be reached only if a liberty interest were at stake, an unwarranted assumption for the reasons we have given in the text. In addition, *Wolff* indicates that the practices the district court criticized are entirely consistent with due process. The Supreme Court stated that, to comport with due process, the state should allow an "illiterate" prisoner faced

with a disciplinary hearing "to seek the aid of a fellow inmate" or "to have adequate substitute aid in the form of help from the staff or from a sufficiently competent inmate designated by the staff." 418 U.S. at 570, 94 S.Ct. 2963.

8. As discussed in the text, housing determinations are judgments by prison officials about where a prisoner will be confined or whether to place a prisoner in protective custody or administrative segregation. *See* D.C. Mun. Regs. tit. 28, §§ 520, 522. Classification decisions involve judgments by prison officials concerning the custodial, program, treatment, and special needs of individual inmates. *See* District of Columbia Department of Corrections Case Management Manual at II–A–3.

interests merely because the District has afforded inmates some kind of hearing. Decisions about where a prisoner should be confined, at what level of custody[9] (maximum, close, medium, minimum, or community) he should be classified, when he should be transferred and so forth are commonplace judgments in the "day-to-day management of prisons." *Sandin*, 515 U.S. at 482, 115 S.Ct. 2293. Unless the prisoner is subjected to some extraordinary treatment, such as transfer to a mental hospital, *see Vitek v. Jones*, 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980), the effect of those judgments on prisoners—that is, the restriction on their liberty—is the ordinary consequence of confinement for committing a crime. The district court did not, and on this record, could not determine that Spanish-speaking prisoners are routinely subjected to greater restraints than other prisoners as a result of housing or classification proceedings. Indeed, the court identified no Spanish-speaking prisoner who even arguably could claim that he had, under the *Sandin* test, been deprived of his liberty as a result of such proceedings. No legal reasoning backs up the district court's order that the District must provide *all* Spanish-speaking prisoners who do not understand English with an official interpreter at *all* stages of the housing and classification "process." And so we also must set aside this portion of the court's injunction.

It is worth repeating that broad decrees rendered in the name of the Due Process Clause, decrees mandating what must *occur* no matter what the circumstances, represent the sort of judicial legislating we have rejected in the past. *See Ellis*, 84 F.3d at 1424. If the district court detected a due process violation in a particular hearing or hearings, the court should have identified the proceeding and provided the District with an opportunity to rectify the deficiency. *See Lewis*, 518 U.S. at 356, 362–63, 116 S.Ct. 2174; *see also Inmates of Occoquan v. Barry*, 844 F.2d 828, 843 (D.C.Cir.1988). The District already has a policy in place to provide interpreters at housing, adjustment and classification hearings; if it follows the policy it is hard to see how there ever could be a due process

infraction of the sort the district court identified. *See Ellis*, 84 F.3d at 1424. The District also possesses other means likely sufficient to prevent a denial of due process in a particular hearing. Just as "jailhouse-lawyers" can provide constitutionally-sufficient access to the courts, *see Lewis*, 518 U.S. at 360 n. 7, 116 S.Ct. 2174, bilingual lawyers, bilingual parole board members, and bilingual housing and adjustment board members (there was one) can translate for Spanish-speaking prisoners so that they understand the proceedings. *See supra* note 7. That is in fact what often happened in the District's prisons when official interpreters were not available. At any rate, only if prison officials had abdicated their constitutional responsibilities could the kind of sweeping injunctive relief ordered by the district court be considered. *See Inmates of Occoquan*, 844 F.2d at 842. The moment has not arrived.

## IV

The district court also ruled that the District had inflicted cruel and unusual punishment on the plaintiff class by failing to provide them with interpreters when they sought medical care.

To establish a violation of the Eighth Amendment's cruel and unusual punishments clause, the prisoners had to prove "deliberate indifference" on the part of the prison authorities. *See Scott v. District of Columbia*, 139 F.3d 940, 942 (D.C.Cir.1998) (citing *Helling v. McKinney*, 509 U.S. 25, 35, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993)). That is, they had to show that the officials were "knowingly and unreasonably disregarding an objectively intolerable risk of harm" to the prisoners' health or safety. *See id.* at 943 (quoting *Farmer v. Brennan*, 511 U.S. 825, 846, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). The officials had to be "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and ... must also draw the inference." *See id.* (quoting *Farmer*, 511 U.S. at 837, 114 S.Ct. 1970).

---

9. *See* District of Columbia Department of Corrections Department Order No. 5010.7, at 3 (July 30, 1986).

In a memorandum setting forth the procedures for obtaining interpreters for Limited English–Proficient inmates, the District stated that it was "essential" that such inmates receive interpreter assistance during medical consultations. In order to provide prompt and reasonable access to interpreters, the District designated a bilingual coordinator for each facility, compiled a bilingual staff roster, and required that the roster be widely disseminated to the prison staff.

The district court seemed to think that the District's failure to implement fully its policy concerning interpreters amounted to "deliberate indifference." But we have said before that "it is hard to see how imperfect enforcement of a ... policy can, alone, satisfy *Helling*'s subjective element. That the District even had such a policy militates against a finding of deliberate indifference." *Scott*, 139 F.3d at 944. For another thing, the prisoners here never established the requisite subjective state of mind for deliberate indifference. There was no proof that senior policymakers or other District officials intentionally deprived prisoners of access to medical care, *see Estelle v. Gamble*, 429 U.S. 97, 105, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), or willfully violated their duty of care, *see Murphy v. United States*, 653 F.2d 637, 644 (D.C.Cir.1981), or that any particular member of the class suffered serious harm from inadequate medical care because of the prisoner's inability to communicate in English. At oral argument, when asked which District official displayed deliberate indifference to members of the plaintiff class, prisoners' counsel named Laura Colon.[10] There is no legal basis for treating a program coordinator like Colon as the kind of senior policymaker whose state of mind can be taken as the District's. *See Triplett v. District of Columbia*, 108 F.3d 1450, 1453 (D.C.Cir. 1997). And the factual basis for the prisoners' accusation—that Colon refused to distribute some signs and pamphlets written in Spanish—borders on the frivolous. A tireless advocate on behalf of the prisoners, Colon led efforts to expand the resources the District made available to Spanish-speaking inmates.

Nor did the evidence establish that the District had acted with the "obduracy" and "wantonness" that mark deliberate indifference. *See Scott*, 139 F.3d at 944 (quoting *Whitley v. Albers*, 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986)). The District operated twenty-seven different nonmedical programs to assist Spanish-speaking inmates. It required Limited English–Proficient prisoners to attend "English as a Second Language" classes six hours per day, five days per week. When deficits depleted the District's budget, the District shielded the Limited English–Proficient Program and the two bilingual case managers from cutbacks. Shortly before trial, the District compiled a list of all Hispanic inmates, revised its master roster of bilingual employees, trained bilingual coordinators, appointed health and mental health service coordinators, designed and administered the language assessment test, and color coded medical charts regarding Hispanic inmates' language proficiency. Such efforts—stretching over the course of years—do not resemble cruel and unusual punishment.[11]

The court's finding of Eighth Amendment violations—despite this evidence of the District's good faith—is flawed in still other respects. The court said the District lacked adequate bilingual staff. Yet the bilingual staffing in the District's prisons exceeded that of comparable prisons. The court found the District's resources for Spanish-speaking inmates to be "meager" and "deficient." Yet the court itself determined that "when com-

10. The prisoners also named a case manager but failed to provide specifics.

11. Contrast *Williams v. Vincent*, 508 F.2d 541 (2d Cir.1974) (cited in *Estelle*, 429 U.S. at 104 n. 10, 97 S.Ct. 285), in which a doctor chose the "easier and less efficacious treatment" of throwing away the prisoner's ear and stitching the stump and which may be attributable to "deliberate indifference ... rather than an exercise of professional judgment." Or *Thomas v. Pate*, 493 F.2d 151 (7th Cir.1974), in which a nurse injected a prisoner with penicillin knowing that the prisoner was allergic and then the doctor refused to treat the prisoner's allergic reaction. Or *Martinez v. Mancusi*, 443 F.2d 921 (2d Cir.1970), a case in which a prison physician refused to administer a prescribed pain killer and performed unsuccessful leg surgery, requiring the prisoner to stand despite a surgeon's contrary instructions.

pared to the percentage of Hispanics in the prison population, the [District] apportions a greater *pro rata* percentage of its resources ... for LEP [Limited English–Proficient] Hispanic inmates than it does for other inmates." The court relied heavily on the testimony of non-medical staff. Yet the court essentially ignored the District's non-medical programs evincing a lack of indifference.

Because the prisoners failed to establish deliberate indifference, we reverse the district court's decision insofar as it held that the Eighth Amendment compelled the District to provide interpreters whenever members of the plaintiff class seek medical care.

## V

■ In a few lines of its liability opinion, the district court ruled that the District had violated the "prisoners' right to medical confidentiality." The court thought it "unjustified" for the District not to employ medical personnel who could translate because, without them, Spanish-speaking prisoners would have to disclose their medical conditions to correctional officials or other inmates who could interpret for them. To enforce this ruling, the court ordered, in part, the District to hire bilingual mental health care providers, to furnish bilingual medical and dental health care providers or translations by a bilingual member of the health care staff "certified as fluent in the Spanish language," and not to use the AT&T Language Line absent a prisoner's knowing and voluntary waiver.

■ The district court presumed that prisoners possess a limited constitutional right to medical confidentiality, a "right to privacy" that may not be infringed without some "valid penological justification." Exactly where in the Constitution this right is located the court did not say.[12] One place might be the Fourth Amendment. But the Supreme Court has held that the expectation of privacy of those incarcerated is severely diminished, so much so that a "right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and

their cells required to ensure institutional security and internal order." *Hudson v. Palmer,* 468 U.S. 517, 527–28, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). Besides, we cannot understand how a prisoner's telling another, bilingual prisoner about his symptoms could amount to an unreasonable search or seizure by the District.

Rather than the Fourth Amendment, the district court may have had the Eighth Amendment in mind. The court cited *Anderson v. Romero,* 72 F.3d 518, 523 (7th Cir.1995), a case in which the Seventh Circuit could not "find any appellate holding that prisoners have a constitutional right to the confidentiality of their medical records," but stating in dictum that the Eighth Amendment might protect against a state's dissemination of "humiliating but penologically irrelevant details of a prisoner's medical history." *Id.* *Anderson's* dictum has nothing to do with this case. Here we have other inmates or correctional staff helping Hispanic prisoners receive medical treatment by translating for them. That is a far cry from "deliberate indifference" to the inmates' health or safety, a necessary element of an Eighth Amendment violation.

When we look beyond the Fourth or Eighth Amendments, we still cannot see how a prisoner's right to medical confidentiality can be derived from the Constitution. The prisoners, in their amended complaint, cited the Due Process Clause of the Fifth Amendment as the basis for this particular claim, although their brief on this subject mentions only the Eighth Amendment. *See* Appellees' Brief at 24. Focusing on the Fifth Amendment, one might contend that a prisoner retains "liberty" not to disclose his medical condition to correctional employees. For obvious reasons, plaintiffs make no such claim. Prisoners cannot obtain treatment except by revealing their medical history and symptoms to government employees. Indeed, the injunction issued here requires the District to hire more medical employees versed in Spanish and English in order to facilitate the receipt of medical information from these

---

12. "Courts do not"—should not—"adjudicate generalized claims of unconstitutionality, but rather resolve constitutional questions by applying these settled doctrines to specific constitu-

tional claims asserted under specific constitutional clauses." *Association of Bituminous Contractors, Inc. v. Apfel,* 156 F.3d 1246, 1253 (D.C.Cir.1998).

plaintiffs. And so the alleged due process "right" must be reformulated to fit plaintiffs' complaint, and when it is, its lack of foundation is exposed. It is a constitutional violation, according to the plaintiffs, if a Spanish-speaking prisoner has to seek help from a fellow inmate to translate his statements into English for the prison doctor. What plaintiffs actually advocate, therefore, is the creation of a constitutional right for non-English speaking prisoners to disclose their medical condition *only* to certain government employees. This is an odd formulation: when recognized in the past, the constitutional right of privacy has protected against disclosure to the state.[13] *See, e.g., Whalen v. Roe,* 429 U.S. 589, 599, 602, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977). Suppose plaintiffs prevailed, suppose members of their class had a due process right to be treated by prison medical personnel who speak their native tongue. Such a constitutional right could hardly be reserved only for Spanish-speaking prisoners. Prisoners who spoke or understood only Arabic, or only Mandarin or Italian or any other of the world's languages would presumably have the same constitutional right when they sought medical treatment. Implementing such a system would inevitably entail considerable disruption and expense, and might well prove to be impossible given the difficulty the District has experienced in recruiting medical staff. Would prison officials have to hire bilingual doctors even if their translating skills could be used for only a handful of prisoners? When the mix of languages among the prisoner population changed from time to time, would the Constitution require adjustments in the prison's medical staffing? Would prison officials have to pass over more qualified physicians in the interest of hiring those who spoke several languages? Would bilingual medical staff have to be maintained around the clock?

These and many other questions would draw the federal courts into the day-to-day management of prisons in a way the Supreme Court and our court have strongly set ourselves against. The District has a strong penological interest, indeed it has an obligation, to furnish adequate medical care to those confined under its authority. *See Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). Hiring more bilingual medical personnel might, or might not, enhance the provision of medical care in the District's prisons. Like all governments, the District has a limited budget; expenditures for one purpose diminish the resources available for others. The District believes that its current combination of bilingual coordinators, medical staff and the AT&T Language Line satisfies its obligations to these prisoners in bridging the language barrier. In a disciplinary hearing in which an illiterate prisoner is threatened with a loss of his constitutional "liberty," the Supreme Court has said that the state fulfills its due process obligation when it allows another inmate or a member of the prison staff to assist the prisoner. *Wolff,* 418 U.S. at 570, 94 S.Ct. 2963. We believe the same is true when the assistance relates to medical treatment rather than proceedings of a legal nature. To put the matter in *Sandin*'s terms, for inmates lacking proficiency in English, having other inmates or correctional employees translate for them when they seek medical care is "one of the ordinary incidents of prison life," 515 U.S. at 484, 115 S.Ct. 2293; indeed, outside of prison it is doubtless an ordinary incident of everyday life for non-English speaking persons to receive help from others in order to communicate with their doctors.[14] For these reasons, we hold that Spanish-speaking prisoners with limited proficiency in English do not have a privacy right, derived from the Con-

---

13. Odd though it may be, one district court summarily endorsed the concept: "Unless the person interpreting for purposes of medical care is bound to maintain the confidentiality of the information being exchanged, the inmate/patient's constitutional privacy right is violated." *Clarkson v. Coughlin,* 898 F.Supp. 1019, 1049 (S.D.N.Y.1995). This elevates the evidentiary doctor-patient privilege and the ethical obligations of physicians to a constitutionally-required status. *But see Whalen,* 429 U.S. at 602, 97 S.Ct. 869.

14. As a general matter, "disclosures of private medical information to doctors, to hospital personnel, to insurance companies, and to public health agencies are often an essential part of modern medical practice even when the disclosure may reflect unfavorably on the character of the patient." *Whalen,* 429 U.S. at 602, 97 S.Ct. 869.

stitution, to force the District to hire bilingual medical personnel so that the prisoners may communicate their medical information only to such employees.

\* \* \*

Insofar as the judgment of the district court relates to parole hearings, the judgment is vacated as moot to the extent it concerns felons and vacated for lack of standing to the extent it concerns misdemeanants. The remaining portion of the district court's order of July 8, 1997, is vacated and the court's liability judgment is reversed.

*So ordered.*