# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued February 16, 2005        Decided May 6, 2005

No. 04-7027

LUCY MURRAY,
APPELLANT

v.

DAVID GILMORE, AS RECEIVER, DISTRICT OF COLUMBIA
HOUSING AUTHORITY AND IN HIS INDIVIDUAL CAPACITY,
APPELLEE

———

Appeal from the United States District Court
for the District of Columbia
(No. 99cv00361)

———

*Veronice A. Holt* argued the cause and filed the briefs for appellant.

*Mona Lyons* argued the cause and filed the briefs for appellee.

Before: ROGERS, TATEL, and GARLAND, *Circuit Judges.*

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: Appellant, an employee of the D.C. Housing Authority, ostensibly lost her job as part of a "reduction

in force" undertaken by the Authority's court-appointed receiver. After unsuccessfully pursuing her administrative remedies, she sued the receiver in his personal and official capacities, alleging wrongful termination in violation of the District's Comprehensive Merit Personnel Act, race discrimination in violation of Title VII and 42 U.S.C. § 1981, sex discrimination in violation of Title VII, and deprivation of due process in violation of 42 U.S.C. § 1983. The district court granted summary judgment to the receiver on all claims except the due process one against him in his official capacity, which the court dismissed without prejudice. Following the district court's denial of her motion to reinstate the due process claim, appellant filed this appeal. We now reverse the grant of summary judgment to the receiver with regard to the Title VII sex discrimination claim against him in his official capacity, but affirm in all other respects.

## I.

In 1995, under the auspices of Judge Graae of the D.C. Superior Court, the D.C. Department of Public and Assisted Housing entered into a settlement agreement to resolve a lawsuit brought by plaintiffs seeking structural reform of the agency. Known as the *Pearson* Order, the agreement provided that the court would appoint a receiver to run the agency for at least three years and gave the receiver significant power to restructure the agency's personnel. *Pearson v. Kelly*, No. 92-14030 (D.C. Super. Ct. May 18, 1995). In part, the order provided:

> As to employees who are not subject to collective bargaining agreements, during the transition from the start-up of the receivership to the implementation of such personnel policies as the receiver shall institute, such employees' rights as to benefits, compensation, and termination (except as stated herein) shall be governed by the Comprehensive Merit Personnel Act, D.C. Code § 1-

601 *et. seq.* Upon the establishment by the receiver of published personnel policies for the governing of employees who are not subject to collective bargaining agreements, these employees shall be subject solely to the personnel policies the receiver shall institute governing the employees' benefits, compensation and termination. The personnel policies established by the receiver for employees who are neither at will employees, employees in their probationary period, nor subject to collective bargaining agreements ("permanent managerial civil service employees"), shall provide that these employees shall not be terminated except for cause or misconduct or for non-performance of duty or due to abolition of their position (as these terms are defined by the receiver in the published personnel policies).

Judge Graae appointed appellee David Gilmore as receiver. For one of his first moves, Gilmore hired a consulting group to evaluate the importance of positions in the department—by then renamed the "Housing Authority"—with annual salaries over $48,000.

Appellant Lucy Murray, an African-American woman, held one such management position: Public Information Officer/Chief of the Office of Public Information. According to her job description, she was responsible for supervising the Office of Public Information, developing the Authority's public information strategy, acting as its principal advisor on public affairs, serving as its official spokesperson, and carrying out other responsibilities related to these tasks. The consultants determined that her position was "essential," explaining that "it would appear that any wholesale turn-around of the agency may require the function and resources of the Office of Public Information. Accordingly, it may be necessary to retain the position of Visual and Public Information Officer." Although Gilmore did not know Murray personally, he associated

her—erroneously, as he now seems to concede—with a bad public relations incident the agency had experienced before he came on board.

In September 1995, Gilmore created a new position—Director of Public Affairs—and hired Arthur Jones, an African-American male, to fill it. The parties debate whether Gilmore publicized this position prior to hiring Jones, but Gilmore acknowledged at his deposition that he considered only Jones for the position. According to the new position's job description, Jones was responsible for supervising the Office of Public Affairs (which had not existed prior to his appointment and of which he was the only member), developing the Authority's public information program, advising the receiver on public affairs, serving as the Authority's official spokesperson, and undertaking related tasks. Though Jones had no housing experience, he had an extensive press background, having served as a Deputy White House Press Secretary and as the City of Boston's Director of Communications.

Several months later, in December 1995, Gilmore issued a personnel manual which provided that the "receiver may reduce the size of the workforce, including by the abolition of positions, when the receiver determines that such action is necessary or prudent." Pursuant to the *Pearson* Order, the manual had the effect of terminating the application of D.C.'s Comprehensive Merit Personnel Act to Housing Authority employees. *See supra* at 2-3.

The next month, Gilmore proposed a reduction-in-force (RIF). If followed, the RIF would have eliminated sixteen positions filled by eight African-American men (of whose positions the consultants ranked four as critical, one as essential, two as non-essential, and one as not needed), four African-American women, including Murray (all of whose positions were ranked as essential), two white men (with one position ranked essential and the other non-essential), and two white

women (with one position ranked non-essential and the other unnecessary). Gilmore's actual RIF, however, departed from this proposal. Ultimately, some positions were not eliminated and of the positions that were, most employees who had held these positions either accepted different jobs within the agency or took voluntary retirement. Only three employees faced other outcomes. An African-American man (whose position was ranked by the consultants as not needed) moved to a job at another agency, and Murray and another African-American woman (both of whose positions were ranked essential) were involuntarily terminated.

Twelve days after Murray's departure, Gilmore changed Jones's job title from Director of Public Affairs to Director of Public Information. A few months after that, Gilmore added a new employee—an "Information Management Specialist"—to the Office of Public Information.

Under the personnel manual, terminated employees could demand a hearing before an examiner, who would make a recommendation to the receiver, who in turn had the final say. Invoking this process, Murray promptly requested a hearing—a request she reiterated in letters sent virtually every month until the summer of 1997 when, roughly a year and a half after her firing, she finally received her hearing. In support of her wrongful termination claim, she argued that Gilmore trumped up the RIF to justify her firing. Gilmore never actually eliminated her position, Murray claimed, but instead simply renamed it and gave it to Jones, letting her go shortly thereafter. At the hearing, a Housing Authority representative acknowledged that Jones's and Murray's positions were "functionally equivalent": "they both had the reporting to the head of the Agency"; "[t]hey both had overall responsibility for the Office of Public Information"; "they both were responsible for supervising the employees in that office"; and "[f]inally, they each were the chief spokesperson."

In summer 1998, a year after the hearing, the examiner issued her recommendation, concluding that Gilmore had functionally replaced Murray with Jones and thus that "the RIF as it affected Murray was a reorganization only on paper and was only a veil for her discharge." The examiner recommended Murray's reinstatement with back pay. Two years later, in September 2000, Gilmore rejected this recommendation and instead upheld Murray's termination.

Perhaps because her internal appeal was progressing slowly, Murray had meanwhile filed a complaint alleging race and sex discrimination with the D.C. Department of Human Rights and Local Business Development. The Department found probable cause for sex discrimination, but since an African American had replaced Murray it found no cause for race discrimination. Murray also sued Gilmore in the U.S. District Court for the District of Columbia. Brought against Gilmore in his representative and individual capacities, her amended complaint alleged violations of Title VII, 42 U.S.C. § 2000e-2; 42 U.S.C. § 1981; D.C.'s Comprehensive Merit Personnel Act, D.C. Code §§ 1-601 to 1-636; and, pursuant to 42 U.S.C. § 1983, the Fifth Amendment's Due Process Clause.

The parties cross-moved for summary judgment. The district court denied Murray's motion and, in fall 2002, granted Gilmore's motion except with regard to Murray's due process claim against Gilmore in his official capacity. *Murray v. Gilmore*, 226 F. Supp. 2d 179 (D.D.C. 2002), *as amended*, 231 F. Supp. 2d 82 (D.D.C. 2002). Finding Murray's basis for the due process claim difficult to "glean," the court "dismissed [that claim] without prejudice subject to reconsideration at such time as plaintiff is able to clearly identify legal and factual bases for proceeding on this claim," *id.* at 190, and ordered the case "taken off the active calendar of the Court," *id.* at 191. Murray moved to reinstate the due process claim, but the court denied the motion in early 2004, concluding that "plaintiff merely

restate[d] her factual allegations" and offered no new legal theory. *Murray v. Gilmore*, No. 99-361 (D.D.C. Feb. 22, 2004). Murray now appeals.

**II.**

As an initial matter, Gilmore questions our jurisdiction to review the issues decided in the district court's 2002 summary judgment order. According to Gilmore, the 2002 order constituted a final order for purposes of 28 U.S.C. § 1291, and Murray's appeal was therefore untimely because she filed it after the 2004 denial of reinstatement. *See* Fed. R. App. P. 3; Fed. R. App. P. 4 (providing that if the district court issues an appealable final order, a party must timely appeal *that* order). Murray sees the 2002 order quite differently. That order was not a final appealable order, she argues, because rather than signaling the "final disposition of the case," *see Franklin v. District of Columbia*, 163 F.3d 625, 629 (D.C. Cir. 1998) (noting that appeal "is to be deferred until final disposition of the case"), it left her due process claim unresolved. Gilmore responds that the court gave a "final disposition" of the due process claim by dismissing it without prejudice. We agree with Murray.

Under *Ciralsky v. CIA*, 355 F.3d 661 (D.C. Cir. 2004), dismissal of an action without prejudice is a final disposition but dismissal of a complaint without prejudice typically isn't. *See id.* at 666-67 (determining that the district court had dismissed the action rather than just the complaint). Here, the district court's decision to "dismiss [the due process claim] without prejudice subject to reconsideration," *Murray*, 226 F. Supp. 2d at 190, was at most a dismissal of the due process portion of the complaint. Had the court intended to dismiss the *action*, it would have done more than just remove the case from its active calendar; it might, for example, have designated the 2002 order as "final and appealable," as did the *Ciralsky* district court, *see*

*Ciralsky*, 355 F.3d at 667.

Gilmore also suggests that even if the district court dismissed only the due process claim (rather than the action), the dismissal was final because Murray could not refile it due to a lapsed statute of limitations. *Cf. id.* at 666 n.1. But the district court plainly contemplated that Murray could reinstate her claim "at such time as plaintiff is able to clearly identify legal and factual bases" for her argument, *Murray*, 226 F. Supp. 2d at 190; *see also Murray*, No. 99-361 (D.D.C. Feb. 22, 2004), leaving Gilmore on notice not just of the claim, but of its continued viability as well. The district court's "dismissal" was thus akin to a grant of leave to amend under Federal Rule of Civil Procedure 15(c), which permits such amendments to relate back to the original filing date for statute-of-limitations purposes. *Cf.* 6A Wright, Miller & Kane, *Federal Practice and Procedure* § 1508 (2d. ed. 1990) (noting that "the policy underlying the statute of limitations is in no way compromised" by permitting amendment if "the defendant is given sufficient notice of the nature of the claim being asserted at the outset of the action"). Because the statute of limitations thus posed no bar to Murray's refiling, the 2002 order was not a final, appealable order, and Murray properly waited until after the 2004 denial of reinstatement to appeal.

## III.

Turning to the merits of Murray's race and sex discrimination claims, we review the district court's grant of summary judgment de novo, viewing the evidence in the light most favorable to Murray, and will affirm only if no reasonable jury could find in her favor. *E.g., Dunaway v. Int'l Bhd. of Teamsters*, 310 F.3d 758, 761 (D.C. Cir. 2002). To determine whether a reasonable jury could find in Murray's favor on her Title VII and 42 U.S.C. § 1981 claims, we use the familiar *McDonnell Douglas* framework. Murray must first make out a

prima facie case. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). As Gilmore concedes, she has done so: "(i) at the time [s]he was fired, [s]he was a member of the class protected by" Title VII and section 1983; "(ii) [s]he was otherwise qualified for the position" of Officer/Chief of the Office of Public Information; "(iii) [s]he was discharged by respondent," *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000); and (iv) as we discuss later, evidence suggests that another employee replaced her, *see Stella v. Mineta*, 284 F.3d 135, 145-46 (D.C. Cir. 2002) (holding that a plaintiff need not show as part of her prima facie case that her replacement came from outside her protected class). This prima facie showing shifts the burden of production to Gilmore, requiring that he proffer a legitimate, nondiscriminatory reason for firing Murray. *See McDonnell Douglas Corp.*, 411 U.S. at 802. Satisfying that burden, he claims he laid her off pursuant to a bona fide RIF. At this point, then, the *McDonnell Douglas* framework disappears, and we must decide whether a reasonable jury could infer intentional discrimination from "(1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer)." *Waterhouse v. District of Columbia*, 298 F.3d 989, 992-93 (D.C. Cir. 2002) (quoting *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir. 1998) (en banc)). This boils down to two inquiries: could a reasonable jury infer that the employer's given explanation was pretextual, and, if so, could the jury infer that this pretext shielded discriminatory motives?

On the first inquiry, Murray contends with respect to her section 1981 claim that principles of collateral estoppel prevent reconsideration of the hearing examiner's conclusions, leaving us bound by the examiner's finding that the RIF justification was pretext. *See United States v. Utah Constr. & Mining Co.*,

384 U.S. 394, 421-22 (1966) (holding that courts can give preclusive effect to certain administrative proceedings); *but see Univ. of Tennessee v. Elliot*, 478 U.S. 788 (1986) (holding that no such preclusion occurs in the Title VII context). But while preclusive effect may sometimes attach to administrative proceedings, we see no reason why it should attach to proceedings where the examiner may only make "recommendations" and lacks power to issue binding judgments. *Cf. Restatement (Second) of Judgments* § 27 (1982) (requiring "valid and final judgment" for issue preclusion). Moreover, Gilmore's role as the final decision-maker undoubtedly reduced his incentive to litigate the case fully, not only by limiting his concerns about the outcome of the administrative process but also by giving him cause to suppose that should preclusion attach at all, it might attach to his final administrative decision rather than the examiner's rejected recommendation. *See id.* § 28(c) (stating that issue preclusion should not apply where "the party sought to be precluded . . . did not have an adequate opportunity or incentive to obtain a full and fair adjudication in the initial action"); *see also id.* § 27 cmt. o (noting that if a decision below is reversed on appeal, the appellate "judgment is conclusive between the parties" in later litigation).

We nonetheless agree with Murray that a reasonable jury could find Gilmore's proffered explanation pretextual. Murray offers plentiful evidence from which a jury could conclude that rather than functionally eliminating the position of Officer/Chief of Public Information, Gilmore simply gave the position a new title and tapped Jones to hold it. Not only are the job descriptions of the two positions quite similar, but a Housing Authority representative testified at the administrative hearing that the positions were "functionally equivalent." Indeed, immediately after Murray's departure, Jones's title changed from "Director of Public Affairs" to "Director of Public Information." Standing alone, such evidence easily creates a material issue of fact as to whether Gilmore's justification was

pretextual. At oral argument, counsel for Gilmore acknowledged as much. After counsel stated, "I concede that . . . obviously a Director of Public Relations and a Public Information Officer have comparable, dual, functionally equivalent, overlapping responsibilities," the court inquired, "And from that . . . a reasonable jury could conclude that this was pretext?" "I believe that's correct," counsel responded. Bolstering an already adequate case, Murray points out that Gilmore not only increased the budget of the Department of Public Information, but also added another employee after Murray left—two facts that support an inference that Gilmore had no need to undertake an RIF within that Department in the first place.

Of course, that a jury could infer pretext does not always mean that a jury could infer race or sex discrimination. As we stated in *Aka v. Washington Hospital Center*, 156 F.3d 1284, 1291 (D.C. Cir. 1998) (en banc), "in some instances . . . the fact that there are material questions as to whether the employer has given the real explanation will not suffice to support an inference of discrimination." We gave two examples of such situations: where "the plaintiff calls the employer's explanation into question, but does so in a way that conclusively demonstrates that the real explanation for the employer's behavior is not discrimination, but some other motivation" and where "the plaintiff has created only a weak issue of material fact as to whether the employer's explanation is untrue and there is abundant independent evidence in the record that no discrimination has occurred." *Id.* The Supreme Court endorsed *Aka*'s approach in *Reeves v. Sanderson Plumbing Products. See* 530 U.S. at 148 (using the same examples in explaining when a jury could not infer discrimination solely from a plaintiff's prima facie case and showing of pretext). The Court explained,

> Whether judgment as a matter of law is appropriate in any
> particular case will depend on a number of factors. Those

include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law.

*Id.* at 148-49.

Murray's two claims—race discrimination and sex discrimination—fare differently under this standard. Her race discrimination claim, like the exceptions given in *Reeves* and *Aka,* fails because even assuming pretext, Gilmore replaced Murray, an African American, with Jones, also an African American. While Murray can make out a prima facie case despite such parity, *see Stella*, 284 F.3d at 145-46, a replacement within the same protected class cuts strongly against any inference of discrimination, *see Brown v. Brody*, 199 F.3d 446, 451 (D.C. Cir. 1999) (noting that a sex discrimination claim based on denial of a lateral transfer "would be baseless because two of the three employees selected for that transfer were women"); *cf. Rand v. CF Indus.*, 42 F.3d 1139, 1147 (7th Cir. 1994) (where same decision-maker hired and fired plaintiff within span of two years, a jury could not draw an inference that he engaged in age discrimination absent specific evidence of animus); *Lowe v. J.B. Hunt Transport, Inc.*, 963 F.2d 173, 174-75 (8th Cir. 1992) (similar).

This does not mean that a jury could never infer discrimination where the plaintiff was replaced by a member of the same protected class. For example, suppose an employer fired ten African-American employees for pretextual reasons and replaced them with nine whites and one African American. Under these circumstances, the employee replaced by the African American could most likely survive summary judgment on a race discrimination claim. But Murray offers no such evidence. She does point out that most "critical" or "essential" positions on the proposed RIF list were occupied by African

Americans, but we doubt a jury could find that particularly persuasive absent evidence showing how many white and African-American employees held "critical" or "essential" positions in the agency as a whole. Similarly, the fact that the only two employees from the proposed RIF list who were involuntarily terminated were African Americans carries little weight given that three-fourths of the listed RIF candidates were African Americans, a proportion not challenged by Murray as itself discriminatory. Because we think no reasonable jury could rely on this evidence to infer race discrimination given Murray's replacement by an African American, we will affirm the district court's dismissal of her Title VII and section 1981 race discrimination claims.

We reach a different conclusion with respect to Murray's Title VII sex discrimination claim. First, because her replacement was a man, her prima facie case is stronger on that claim. *See Reeves*, 530 U.S. at 148-49. Second, "the proof that the employer's explanation is false," *id.* at 149, was strong, and we see no circumstances like those hypothesized in *Aka* and *Reeves* that would preclude a rational factfinder from inferring discrimination from pretext. While the pretext may conceal other motives—such as that Gilmore thought the agency needed a better spokesperson or distrusted Murray due to his inaccurate belief that she had caused a prior press debacle—nothing in the record demonstrates this anywhere near as "conclusively," *see Aka*, 156 F.3d at 1291; *Reeves*, 530 U.S. at 148, as in the Eighth Circuit decision cited in *Aka*, where the plaintiff himself had argued "that in fact the real reason he had been discharged was that he had discovered that his firm was not in compliance with Securities and Exchange Commission rules and his employer wished to cover the problem up." *See Aka*, 156 F.3d at 1291 (describing *Rothmeier v. Investment Advisers, Inc.*, 85 F.3d 1328 (8th Cir. 1996)). Nor is this a case with either a "weak issue of material fact as to whether the employer's explanation is untrue" or "abundant independent evidence in the record that no

discrimination has occurred," let alone both. *See id.* (hypothesizing a case where the employer has a "strong record of equal opportunity employment" with 40% of the workforce made up of protected class members compared to a relevant labor market of only 10% protected class members).

Pointing out that he proposed eliminating positions occupied by both men and women, Gilmore argues that a reasonable jury could not infer sex discrimination. But even assuming those other actions were nondiscriminatory, we doubt this could prevent a jury from inferring sex discrimination *in Murray's case*. Moreover, viewing the facts in Murray's favor, we think a reasonable jury could find that the RIF's outcome supports rather than undermines her claim of sex discrimination. Sixteen individuals, fewer than half women, occupied the positions identified for the RIF. When the dust settled, the only two involuntarily separated were women. While others left the agency, including two men who retired and another who went to a different agency, Gilmore points to nothing in the record that would require a jury to infer that these men would have faced involuntary separation otherwise.

In sum, Gilmore offers no reason, nor can we think of one, that would necessarily prevent a reasonable jury from inferring sex discrimination as to Murray if it found his proffered reason for abolishing her position pretextual. Murray's Title VII sex discrimination claim thus survives summary judgment. Of course, that claim lies only against Gilmore in his official capacity, as our case law clearly precludes a suit against him individually. *See Gary v. Long*, 59 F.3d 1391, 1399 (D.C. Cir. 1995).

## IV.

Murray has waived her remaining two claims. In order for her claim under D.C.'s Comprehensive Merit Personnel Act to survive summary judgment, she must demonstrate that her

termination (for purposes of the Act) occurred at the time of Jones's hiring rather than at the time of the RIF, since by the latter time Gilmore had issued the personnel manual that (pursuant to the *Pearson* Order) ended the Act's applicability to Housing Authority employees like Murray. Because Murray's brief nowhere argues this point, she has waived the claim. *See, e.g.*, *City of Waukesha v. EPA*, 320 F.3d 228, 250 n.22 (D.C. Cir. 2003) (per curiam) (argument inadequately raised in opening brief is waived). Murray has similarly waived her due process claim by failing to argue that she has a constitutionally protected property interest in her job. Indeed, she nowhere responds to Gilmore's assertion that employees terminated pursuant to an RIF lack such an interest. *See id.*; *cf. Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983) (noting that the "premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them"). Because none of Murray's claims against Gilmore in his personal capacity remains alive, we leave for another day the issue of whether, as Gilmore argues, court-appointed receivers enjoy quasi-judicial immunity in their personal capacity.

We reverse the district court's entry of summary judgment for Gilmore with respect to Murray's Title VII sex discrimination claim against him in his official capacity and remand for further proceedings. In all other respects, we affirm.

*So ordered.*