# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued October 14, 2014        Decided December 16, 2014

No. 13-7093

MICHAEL H. HOLLAND, ET AL.,
APPELLEES

v.

BIBEAU CONSTRUCTION COMPANY, A CORPORATION,
APPELLANT

VALLEY SERVICES, INC., A CORPORATION,
APPELLEE

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:06-cv-00178)

---

*John R. Woodrum* argued the cause and filed the briefs for appellants.

*Kathleen B. Burns* argued the cause for appellees. With her on the briefs were *David W. Allen* and *Larry D. Newsome*.

Before: ROGERS, GRIFFITH and WILKINS, *Circuit Judges*.

ROGERS, *Circuit Judge*: The Coal Industry Retiree Health Benefit Act of 1992 ("the Coal Act"), 26 U.S.C. §§ 9701–9722, created multiemployer benefit plans to provide health care to

retired and disabled coal miners and to collect premiums from their former employers. Bibeau Construction Company, Inc. ("Bibeau") appeals the grant of summary judgment and order directing it, as a "related person" to a disabled miner's former employer, to pay health insurance premiums, interest, and liquidated damages to the United Mine Workers of America 1992 Benefit Plan ("the Plan"). Bibeau contends that the district court erred in ruling that the equitable doctrine of laches did not apply even though it received no notice of its payment obligation until nine years after premiums started to accrue. Whatever merit Bibeau's laches claim might have had when it filed its notice of appeal, it is now precluded under *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct. 1962 (2014), because each premium installment gives rise to a separate cause of action for legal relief for which Congress has enacted a statute of limitations to govern timeliness. Bibeau also contends the district court should not have awarded interest and liquidated damages, but the statutory damages provision plainly requires otherwise. Accordingly, we affirm.

## I.

The history of the Coal Act is well documented elsewhere. *See, e.g.*, *Eastern Enterprises v. Apfel*, 524 U.S. 498 (1998); *Holland v. Williams Mountain Coal Co.*, 256 F.3d 819, 821 (D.C. Cir. 2001); *Penn Allegh Coal Co., Inc. v. Holland*, 183 F.3d 860, 861–62 (D.C. Cir. 1999). From the turn of the 20th century until the 1940s, health care for coal miners was largely provided by "company doctors" in rural settings where care was often deficient. The efforts of their union, the United Mine Workers of America ("UMWA"), to obtain better health care proved unsatisfactory, and a nationwide strike was called in 1946. The strike ended when the UMWA president, John L. Lewis, and the Secretary of Interior, Julius Krug, agreed to fund miners' health care and pensions through national trust funds.

Similar trust funds were part of collective bargaining agreements between miners and coal mine operators signed in 1947 and 1950.

In 1974, Congress enacted the Employee Retirement Income Security Act ("ERISA"), Pub. L. No. 93-406, 88 Stat. 829, *codified at* 29 U.S.C. §§ 1001 *et seq.* Based on ERISA's funding and vesting requirements, the UMWA and the mining companies entered into a new collective bargaining agreement in 1974, which provided for retirees' health benefits. The 1974 benefit plan also provided benefits for spouses and widows, which significantly expanded the number of beneficiaries, and quickly imperiled the financial health of the plan. To remedy the funding shortfall, the 1978 collective bargaining agreement departed from the royalty funding model. Instead of requiring a defined *contribution* based on coal production, signatory coal operators were made responsible for providing defined *benefits* for all of their current and former employees. The 1978 agreement also included "guarantee" and "evergreen" clauses by which operators promised to fund health care benefits as long as they stayed in the coal industry.

Valley Services, Inc., operated a strip mine in Wyoming County, West Virginia, beginning in the late 1960s. Ovila Bibeau, the owner of Bibeau Construction, Inc., acquired Valley Services in 1975. Valley Services was a signatory to the 1974 and 1978 collective bargaining agreements. It ceased operations in 1979, and by 1982 had paid off its debts and dissolved. A number of other mining companies also ceased operations in the 1980s. *See Penn Allegh Coal*, 183 F.3d at 861. To address the resulting shortfall in funding for miners' health care and pensions, the Secretary of Labor appointed a commission to conduct a study of health care in the coal industry and develop a "solution for assuring that orphan retirees . . . will continue to receive promised medical care." Report of the Coal Advisory

Comm'n on UMWA Retiree Health Benefits 2 (1990). Based on the Commission's recommendations, Congress enacted the Coal Act, which mandated the creation of the UMWA 1992 Benefit Plan to pay health care benefits and collect premiums from former employers and their successors. *See* Pub. L. No. 102-486, 106 Stat. 3036, *codified at* 26 U.S.C. §§ 9701–9722; *Penn Allegh Coal*, 183 F.3d at 861–62.

The Coal Act requires a "last signatory operator" — defined as "a signatory to a coal wage agreement" who was a retiree's "most recent coal industry employer," 26 U.S.C. § 9701(c)(1), (4) — to pay a monthly premium for former employees who are receiving benefits from the 1992 Plan. 26 U.S.C. §§ 9711, 9712(d)(1), (3). If a last signatory operator has gone out of business, then a "related person" is jointly and severally liable for premiums. 26 U.S.C. § 9712(d)(4). A "related person" is defined to be, among other things, "a member of the controlled group of corporations . . . which includes such signatory operator." *Id.* § 9701(c)(2)(A)(i).

The Coal Act incorporates ERISA's enforcement scheme, providing that "[t]he provisions of [29 U.S.C. § 1451] shall apply, in the same manner as any claim arising out of an obligation to pay withdrawal liability under [ERISA], to any claim — (1) arising out of an obligation to pay any amount required to be paid by [the Coal Act] . . . ." 26 U.S.C. § 9721. These ERISA provisions impose liability on employers for delinquent contributions to a multiemployer plan, 29 U.S.C. § 1145, and provide for a civil action to recover unpaid contributions, *id.* § 1451(a). A remedial section provides:

> [When] judgment in favor of the plan is awarded, the court shall award the plan — (A) the unpaid contributions, (B) interest on the unpaid contributions, (C) an amount equal to the greater of

[interest or contractual liquidated damages, if less than 20% of unpaid contributions], (D) reasonable attorney's fees and costs of the action, to be paid by the defendant, and (E) such other legal or equitable relief as the court deems appropriate.

*Id.* § 1132(g)(2). The cause of action is subject to a statute of limitations: "the later of — (1) 6 years after the date on which the cause of action arose, or (2) 3 years after the earliest date on which the plaintiff acquired or should have acquired actual knowledge of the existence of [the] cause of action." *Id.* § 1451(f).

One of Valley Services' employees was Arthur Marcum, whose benefit premiums are the subject of this appeal. He suffered a back injury on the job in 1979. His injury developed into a permanent disability, and in 1991 he received a disability determination from the Social Security Administration. In 1995, the UMWA 1974 Pension Plan assigned him a disability pension, and he was enrolled for health care benefits under the Coal Act's 1992 Plan, which determined that his eligibility for health benefits dated back to 1993. The Plan discovered that Valley Services — his last coal industry employer — was no longer in business and determined in 2004 that Bibeau was a "related person" to Valley Services. By letter of December 6, 2004 the Plan notified Bibeau it was a "related person" and therefore jointly and severally liable for payment of monthly per-beneficiary premiums for Valley Services' eligible beneficiaries; it requested payment for Marcum's premiums for the period beginning in 1993. When Bibeau did not pay, the Plan, by letter of October 17, 2005 advised that a failure to pay within fifteen days would be treated as a delinquency for which the Plan would seek payment of all amounts owed, including interest, liquidated damages, attorney's fees, and costs. When Bibeau still did not pay, the Plan filed suit on February 1, 2006.

After discovery, Bibeau moved for summary judgment on the grounds that the complaint was untimely and, alternatively, that the doctrine of laches barred the lawsuit. The Plan also moved for summary judgment.

The district court granted summary judgment to the Plan for premiums that became due after May 15, 2001. *Holland v. Valley Services, Inc*., 612 F. Supp. 2d 75, 79 (D.D.C. 2009). Ruling that Bibeau's laches defense was unavailable under the Coal Act, the district court explained that a new cause of action accrued as each monthly premium became due. *See id.* at 79–80. The district court initially rejected as time-barred all premiums due before 2001, but upon granting the Plan's motion to amend, calculated the limitations period by counting back six years from the date the complaint was filed, to 2000. *Holland v. Valley Services, Inc.*, 845 F. Supp. 2d 220, 223–24 (D.D.C. 2012). The district court awarded damages for the period February 1, 2000 through March 15, 2012, leaving to the parties to resolve damages that had accrued since March 15, 2012 and any other future liabilities. Order, May 23, 2013. Bibeau appeals, and our review of the grant of summary judgment is *de novo*, *see CarrAmerica Realty Corp. v. Kaidanow*, 321 F.3d 165, 170 (D.C. Cir. 2003).

## II.

As a threshold matter, the court must determine whether it has subject-matter jurisdiction of this appeal. *See Citizens for the Abatement of Aircraft Noise, Inc. v. Metro. Wash. Airports Auth.*, 917 F.2d 48, 53 (D.C. Cir. 1990), *aff'd*, 501 U.S. 252 (1991). This court's jurisdiction extends to "appeals from all final decisions of the district courts . . . ." 28 U.S.C. § 1291. To be "final," a decision must determine not just liability, but also remedies. *See Franklin v. Dist. of Columbia*, 163 F.3d 625, 628–30 (D.C. Cir. 1998).

The district court's Order of May 23, 2013 directed Bibeau to pay $241,227.21 for the period February 1, 2000 through March 15, 2012 for unpaid contributions, interest, liquidated damages, attorney's fees, and costs. For the period after March 15, 2012 the district court ordered:

> [T]he parties shall confer in good faith to resolve in accordance with this Order any remaining damages issues, including any necessary recalculation of unpaid premiums, interest, liquidated damages, attorney's fees, and costs that have accrued since March 15, 2012 and any other liabilities that may accrue going forward.

*Id*. Further, if "the parties desire to have a magistrate judge assigned to assist with the resolution of the remaining calculation of damages or for settlement purposes, the parties shall file a . . . Joint Motion for Appointment of a Mediator." *Id*. (internal quotation marks omitted). The district court set a daily interest payment of $13.12 to be applied to the remaining calculations.

In *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962), which involved a government antitrust challenge to the merger of two manufacturers and sellers of shoes, the Supreme Court held that a district court order requiring divestiture was "final" under 15 U.S.C. § 29 despite the order's requirement that one party "propose in the immediate future a plan for carrying into effect the court's order of divestiture." *Id*. at 308. This left the district court the "remaining task" of "acceptance of [the] plan" and "administering its decree." *Id.* The Court explained that the order was final because any further rulings by the district court would be "sufficiently independent of, and subordinate to, the issues presented by this appeal." *Id*. The issues presented on appeal were "on an 'all or nothing' basis," and "[r]epetitive

judicial consideration of the same question in a single suit will not occur here." *Id.* at 309. This court has recognized the possibility that a remedy decision that leaves open only "mechanical and uncontroversial" calculations may be "final" for purposes of 28 U.S.C. § 1291. *See A&S Council Oil Co., Inc. v. Lader*, 56 F.3d 234, 238 (D.C. Cir. 1995). Other circuit courts of appeals have so held. *See Cook v. Rockwell Int'l Corp.*, 618 F.3d 1127, 1137–38 (10th Cir. 2010); *Marshak v. Treadwell*, 240 F.3d 184, 190–91 (3d Cir. 2001); *Parks v. Pavkovic*, 753 F.2d 1397, 1401 (7th Cir. 1985).

Not all damages calculations under 29 U.S.C. § 1132(g)(2) will be "mechanical and uncontroversial." *See, e.g.*, *Dieser v. Continental Cas. Co.*, 440 F.3d 920, 924 n.3 (8th Cir. 2006). But here the district court addressed the Plan's requested remedies in detail and left for future resolution only the amount of damages that had accrued since the parties filed their last estimates in March 2012. The remaining dollar amounts are predetermined by the Plan's premium schedule, the unchallenged rate of interest set by the district court, and the statutory formula for liquidated damages, *see* 29 U.S.C. § 1132(g)(2)(C). The district court also prescribed, if needed, an informal method for resolution of the remaining amounts. Bibeau's contentions on appeal — the availability of laches as a defense to liability, and the propriety of the awards of pre-notice interest and liquidated damages — are separate from and "subordinate to," *Brown Shoe*, 370 U.S. at 308, the amount of damages that has accrued since March 15, 2012.

Given the mechanical nature of the remaining calculations, the danger of "[r]epetitive judicial consideration of the same question[s]," *id.* at 309, appears remote at best, and any danger that the remaining calculations will produce an appealable issue is no greater than was true in *Brown Shoe*. The Order of May 23, 2013 is thus sufficiently final for this court to have subject-

matter jurisdiction under 28 U.S.C. § 1291.

### III.

The defense of laches bars a suit filed within the statute of limitations when a plaintiff unreasonably delays filing suit and the defendant is prejudiced. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 121–22 (2002). Nine years elapsed between the time the Plan enrolled Marcum in 1995 and notified Bibeau of its premium obligations in 2004. Bibeau maintains that the Plan's failure to search diligently for a "related person" to Valley Services was prejudicial because, in the intervening years, Valley Services' records and other evidence by which Bibeau might have been able to contest Marcum's injury, or the injury's relation to his employment with Valley Services, were destroyed by fire and flood. Consequently, it maintains, the district court erred by not applying laches and dismissing the Plan's suit.

The Coal Act requires coal operators and "any related person" to pay for miners' health care in monthly installments. 26 U.S.C. § 9712(d)(3), (4); *see* 29 U.S.C. § 1145. A cause of action to collect such installment payments separately accrues with each missed payment. In *Bay Area Laundry and Dry Cleaning Pension Trust Fund v. Ferbar Corporation of California, Inc.*, 522 U.S. 192 (1997), a pension fund sued to recover for withdrawal liability under the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), Pub. L. No. 96-364, 94 Stat. 1208, *codified at* 29 U.S.C. §§ 1381–1461, which imposes "withdrawal liability" on employers who withdraw from a multiemployer pension plan, in order to ensure that those employers continue to fund their employees' pensions. *See id.* § 1381(a). When an employer withdraws, the plan must calculate the benefits due and notify the employer of its withdrawal liability "[a]s soon as practicable," *id.* §§

1399(b)(1), 1382.  The Supreme Court explained that under the MPPAA, a "withdrawing employer's basic responsibility . . . is to make each withdrawal liability payment when due."  *Bay Area Laundry*, 522 U.S. at 208.  Because "the plan generally [must] wait until the employer misses a particular payment before suing to collect *that payment*," each missed payment carries its own statute of limitations.  *Id.* (emphasis in original).

Liability under the Coal Act works in a similar way.  The responsibility of the employer (or "any related person") is to "make [Plan] contributions," 29 U.S.C. § 1145, as they become due each month, 26 U.S.C. § 9712(d).  Like the MPPAA installment liability considered in *Bay Area Laundry*, Coal Act installment liability separately accrues with each missed payment.  Bibeau suggests in its reply brief that the Plan's right to assert "related person" liability is a *separate* cause of action that accrues on the date a miner is enrolled in the Plan.  Under this theory, because Marcum was enrolled in 1995, the Plan had only "until 2001 to locate a 'related person' to Valley Services and sue for a judicial declaration establishing its joint and several responsibility."  Reply Br. 3.  The court generally does not consider arguments made for the first time in a reply brief. *See, e.g.*, *Students Against Genocide v. Dep't of State*, 257 F.3d 828, 835 (D.C. Cir. 2001).  Bibeau offers no explanation for its failure to include this argument in its opening brief, much less suggests extraordinary circumstances as might excuse its failure. In any event, Bibeau can point to no statutory reference to a separate declaratory action to establish "related person" liability. The Coal Act instead provides that "any related person to any [last signatory coal] operator shall be jointly and severally liable with such operator for any amount required to be paid by such operator under this section."  26 U.S.C. § 9712(d)(4); *see id*. § 9712(d)(3).  The incorporated provisions of ERISA regarding the cause of action, 29 U.S.C. §§ 1145, 1451(a)(1), and remedies, *id.* § 1132(g)(2), also do not include such a reference.

Bibeau thus offers no reason to conclude that the Coal Act's separate accrual works differently than the installment payments held in *Bay Area Laundry* to accrue with each delinquency.

Because the claims that the district court ordered Bibeau to pay were timely filed, the doctrine of laches cannot bar the suit under the Supreme Court's recent instruction in *Petrella*, 134 S. Ct. 1962. In that case, the Supreme Court held that laches were unavailable as a defense to copyright infringement claims filed within the three-year statute of limitations, 17 U.S.C. § 507(b), because "courts are not at liberty to jettison Congress' judgment on the timeliness of suit." *Petrella*, 134 S. Ct. at 1967. Although addressing a different statute, the Court's reasoning as to legal claims was categorical: "[W]e have never applied laches to bar in their entirety claims for discrete wrongs occurring within a federally prescribed limitations period." *Id.* at 1975. The Court explained that a "statute of limitations . . . itself takes account of delay," because "a successful plaintiff can gain retrospective relief only three years back from the time of suit." *Id.* at 1973. Because Congress had provided "a right to sue for infringement occurring no more than three years back from the time of suit," there was "little place for a doctrine that would further limit the timeliness of a copyright owner's suit." *Id.* at 1977 (internal quotation marks omitted).

The circumstances of *Petrella* are analogous to Bibeau's. There, the infringing movie studio had used a copyrighted screenplay under assignment from the author. When the author died, "renewal rights reverted to his heirs, who could renew the copyrights unburdened by any assignment previously made by the author." *Id.* at 1971. The remaining heir, *see id.* at 1971 n.8, renewed the copyright in 1991 and sued in 2009, decades after the screenplay was copyrighted (initially in 1963) and the movie was released (in 1980). *See id.* at 1970–71. Citing *Bay Area Laundry*, the Court held that the infringement cause of action re-

12

accrued with each act of infringement. *See id.* at 1969. Under the Copyright Act, 17 U.S.C. § 507(b), the studio could therefore be sued for unauthorized reproduction or use of the movie that had occurred within three years prior to suit. *Id.* at 1968–69. Dismissing concerns about the type of evidentiary prejudice Bibeau claims, the Court explained that in enacting rights exercisable by an author's heirs decades after a work was copyrighted, "Congress must have been aware that the passage of time and the author's death could cause a loss or dilution of evidence. Congress chose, nonetheless, to give the author's family a second chance to obtain fair remuneration." *Id.* at 1976 (internal quotation marks omitted).

The Court in *Petrella* distinguished the cases on which Bibeau relies. For example, the Court distinguished the Title VII "hostile-work-environment claims" in *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 121 (2002), that are "cumulative in effect and extend[] over long periods of time," where a laches defense was allowed, from "discrete wrongs, all of them occurring within a federal limitations period," like the copyright infringement claims before it. *Petrella*, 134 S. Ct. at 1975 n.16; *see id.* at 1970 n.7. The Court also addressed a suggestion in *Bay Area Laundry*, 522 U.S. at 205, that an employer facing MPPAA withdrawal liability could raise a laches defense in arbitration if the plan trustees "failed to comply with their 'as soon as practicable' responsibility." The Court noted that the *Bay Area Laundry* "opinion considered laches *only* in the context of a federal statute calling for action '[a]s soon as practicable.'" *Petrella*, 134 S. Ct. at 1975 n.16 (emphasis added) (quoting 29 U.S.C. § 1399(b)(1)). The Copyright Act, by contrast, contained no equivalent language. Neither does the Coal Act, which, consistent with its purpose "to stabilize plan funding," *Ass'n of Bituminous Contractors, Inc. v. Apfel*, 156 F.3d 1246, 1248 (D.C. Cir. 1998) (citation omitted), permits imposition of liability on employers and related persons

even though assignment of the beneficiaries to employers was not performed in a timely manner, *see Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 171 (2003).

Of the two circumstances identified in *Petrella* in which delay might still serve as a defense when a claim is filed within the statute of limitations, *see Petrella*, 134 S. Ct. at 1967 & n.1, both concerned equitable relief, which is not at issue here. The Coal Act damages awarded by the district court were legal (not equitable) and mandatory.

## IV.

Bibeau also contends that the district court erred in awarding interest and liquidated damages for the period prior to the Plan's December 2004 notice of Bibeau's payment obligations. Because the remedial provisions of the Coal Act are mandatory, we find no error, much less an abuse of discretion, by the district court. *See Kifafi v. Hilton Hotels Retirement Plan*, 701 F.3d 718, 725 (D.C. Cir. 2012); *Brayton v. Office of the U.S. Trade Representative*, 641 F.3d 521, 524 (D.C. Cir. 2011) (quoting *Kickapoo Tribe v. Babbitt*, 43 F.3d 1491, 1497 (D.C. Cir. 1994)).

## A.

Under the Coal Act, 26 U.S.C. § 9721 (incorporating ERISA's enforcement scheme), a "plan fiduciary . . . may bring an action for appropriate legal or equitable relief," 29 U.S.C. § 1451(a)(1), to enforce an employer's "obligat[ion] to make contributions to a multiemployer plan . . . ," *id.* § 1145. The damages provision mandates that "[i]n any action . . . to enforce section 1145 . . . in which a judgment in favor of the plan is awarded, the court *shall* award the plan . . . (B) interest on the unpaid contributions." *Id.* § 1132(g)(2) (emphasis added). By its plain terms, the award of "interest on the unpaid

contributions" is mandatory, and because the contributions for which Bibeau was found to be liable dated back to 2000, the district court ordered interest for that period.

Bibeau's reasons for contending the district court erred are unavailing. Bibeau maintains that it owes interest only on *delinquent* contributions, and that it "could not have been delinquent in payments to the Plan until it was provided notice of its obligation and failed to pay." Reply Br. 22–23; *see* Appellant's Br. 39–41. The remedial provision, 29 U.S.C. § 1132(g)(2), does not distinguish between unpaid contributions and interest; the word "delinquent" appears only in § 1145, which imposes the obligation to pay premiums, not interest. Accepting Bibeau's approach would mean that if employers were not "delinquent" for purposes of interest until they received notice from the Plan, then they would also not be "delinquent" for purposes of unpaid contributions. Yet Bibeau acknowledges that its liability extends to pre-notice "unpaid contributions," *see id.* § 1132(g)(2)(A). *See* Reply Br. 22–23, 24.

Similarly, in relying on the phrase in the Coal Act that liability shall apply "in the same manner as . . . withdrawal liability," 26 U.S.C. § 9721, Bibeau assumes that all aspects of Coal Act liability work in the same way as withdrawal liability under the MPPAA. The MPPAA provides that a failure to pay "within the time prescribed shall be treated in the same manner as a delinquent contribution [under § 1145]." 29 U.S.C. § 1451(b). Bibeau reasons that "within the time prescribed" in the Coal Act context "necessarily means the time prescribed by the 1992 Benefit Plan," which shows that "an employer cannot be delinquent in the payment of an obligation that it did not and could not know existed." Appellant's Br. 42. Again, this reasoning would necessarily extend to pre-notice unpaid contributions, and must be rejected. Furthermore, under the

MPPAA, the multiemployer plan prescribes the time for payment, *see* 29 U.S.C. § 1382, whereas under the Coal Act, liability accrues without any action by the plan, *see* 26 U.S.C. § 9712(d). Bibeau fails to demonstrate that the structure of the Coal Act's enforcement scheme relieves it from paying pre-notice interest.

Bibeau's reliance on *Huber v. Casablanca Industries, Inc.*, 916 F.2d 85 (3d Cir. 1990) (overruled on other grounds in *Milwaukee Brewery Workers' Pension Plan v. Jos. Schlitz Brewing Co.*, 513 U.S. 414 (1995)), is misplaced. *Huber* involved an arbitrator's denial of pre-notice interest on withdrawal liability, and the Third Circuit reasoned that "[t]here is no inequity in this result, as the delay in making the demand was attributable to the Fund." *Id.* at 99–100. The equity of an arbitration award is not at issue in the instant case. Further, in *Huber*, the interest was calculated under 29 U.S.C. § 1399(c)(1), which addresses withdrawal liability, not 29 U.S.C. § 1132(g)(2), which damages calculations Bibeau challenges here. *Huber* does not address the scope of damages under the Coal Act.

Moreover, ordering Bibeau to pay pre-notice interest does not create the unfairness that Bibeau suggests in maintaining that "the loss of the use of money which interest aims to protect properly falls on the 1992 Plan," Appellant's Br. 43, because Bibeau "had no way of knowing it had an obligation to pay premiums to the 1992 Plan until it received notice of the Plan's claim," Reply Br. 24. Interest merely equalizes the time value of money, making the same amount similarly valuable when paid at different times. *See Motion Picture Ass'n of America, Inc. v. Oman*, 969 F.2d 1154, 1157 (D.C. Cir. 1992); *Oklahoma Aerotronics, Inc. v. United States*, 943 F.2d 1344, 1348 (D.C. Cir. 1991). Bibeau does not challenge the correctness of the interest rate, which should therefore have made it indifferent

between paying one amount in the past and the same amount plus interest at a later date.

**B.**

Bibeau's challenge to the award of liquidated damages flounders on the plain text of section 1132(g)(2), which provides that "the court shall award the plan . . . (C) an amount equal to the greater of—(i) interest on the unpaid contributions, or (ii) liquidated damages provided for under the plan . . . ." 29 U.S.C. § 1132(g)(2). The text admits of no exceptions, and the district court awarded the Plan double interest on the unpaid premiums within the limitations period.

Bibeau emphasizes that the Plan initially demanded it pay premiums back to 1993, far overstating its actual liability, and maintains that the Coal Act "does not address a situation where" the initial demand overstates the liability. Appellant's Br. 47. The text of § 1132(g)(2)(C) contains no such exception. The purpose of the liquidated damages provision is to "enforce prompt payment." *I.A.M. Nat'l Pension Fund, Benefit Plan A v. Monal Mfg. Co.*, 607 F. Supp. 512, 514 (D.D.C. 1985), *vacated on other grounds*, 1987 WL 12796 (D.D.C. June 10, 1987). That purpose was borne out here. Liquidated damages apply only to the "*unpaid* contributions." 29 U.S.C. § 1132(g)(2)(c) (emphasis added). After receiving the Plan's December 2004 demand letter, Bibeau could have paid the premiums that fell within the limitations period and challenged the Plan's demand for additional unpaid contributions if the Plan filed suit. Had Bibeau done so, it could have cited authority from six other circuit courts of appeals concluding that liquidated damages apply only to contributions that are unpaid as of the time a plan files suit, as well as another circuit concluding § 1132(g)(2)(B) applies only if there are unpaid contributions as of the date of the award. *See United Automobile Workers Local 259 Social Sec. Dep't v. Metro Auto Ctr.*, 501 F.3d 283, 289 (3d Cir. 2007)

(discussing cases). In any event, Bibeau explains that it did not think it owed any premiums because of laches. *See* Oral Arg. Rec. at 36:58–37:23. Yet the liquidated damages provision was designed to prevent having "simple collection actions" turn into "lengthy, costly and complex litigation concerning claims and defenses unrelated to the employer's promise and the plans' entitlement to the contributions." Senate Comm. on Labor and Human Resources, 96th Cong., 2d Sess., S. 1076, *The Multiemployer Pension Plan Amendments of 1980: Summary and Analysis of Consideration*, at 45 (Comm. Print 1980).

Alternatively, Bibeau maintains that the district court should not have awarded liquidated damages for the pre-notice period because it "could not have been delinquent in any obligation to the Plan" before it received notice. Appellant's Br. 48. This argument fails for the same reason it failed as to pre-notice interest. Bibeau further maintains that awarding liquidated damages for the pre-notice period would "reward[] the Plan" for its delay in notifying Bibeau of its obligations and for overstating the amount that was owed. *Id.* Bibeau does not suggest that the Plan intentionally delayed notification, and the Plan gave Bibeau an opportunity to pay its obligations before filing suit. Bibeau fails to demonstrate any error by the district court in adhering to the plain text of 29 U.S.C. § 1132(g)(2).

Accordingly, we affirm the judgment and the May 23, 2013 Order on damages.