# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued September 19, 2019       Decided January 17, 2020

No. 18-7159

MICHAEL H. HOLLAND, AS TRUSTEE OF THE UMWA 1992
BENEFIT PLAN, ET AL.,
APPELLEES

v.

ARCH COAL, INC.,
APPELLANT

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:17-cv-00300)

---

*John R. Woodrum* argued the cause and filed the briefs for appellant.

*Stephanie Schuster* argued the cause for appellees. With her on the brief were *John R. Mooney*, *Paul A. Green*, *John C. Goodchild, III*, *Bryan Killian*, and *Stanley F. Lechner*. *Diana M. Bardes* entered an appearance.

Before: TATEL and SRINIVASAN, *Circuit Judges*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* GINSBURG.

GINSBURG, *Senior Circuit Judge*: The Coal Industry Retiree Health Benefit Act of 1992 (Coal Act) created the United Mine Workers of America 1992 Benefit Plan (1992 Plan) to provide benefits to retirees of coal companies that had signed retiree benefits agreements with the Union. Certain of those companies, referred to here as "1988 last signatory operators," or LSOs for short, are responsible for financing the benefits provided by the 1992 Plan. The Trustees of the 1992 Plan seek to compel Arch Coal to provide security pursuant to the Coal Act as a person related to an LSO. Arch Coal argues the Coal Act does not require related persons to provide security – as opposed to financing benefits – or alternatively that the security previously provided on behalf of Arch Coal's former subsidiaries (or the proceeds thereof) already satisfied the requirement.

We hold the Coal Act requires Arch Coal, as a person related to an LSO, to provide security and that the security previously provided on behalf of Arch Coal's former subsidiaries does not satisfy that requirement. We therefore affirm the judgment of the district court.

## I.    Background

Starting in 1947, the Union and the operators negotiated a series of National Bituminous Coal Wage Agreements ("NBCWAs"), *E. Enters. v. Apfel*, 524 U.S. 498, 505–11 (1998), under which the operators "agreed to pay benefits not only for their workers but also for workers whose employers had failed to meet their obligations under the agreement, so-called orphaned workers," *Holland v. Williams Mountain Coal Co.*, 256 F.3d 819, 821 (D.C. Cir. 2001). Over time "more and more coal operators abandoned the Benefit Plans" created by these NBCWAs, forcing "the remaining signatories . . . to absorb the increasing cost of covering retirees left behind by

exiting employers." *E. Enters.*, 524 U.S. at 511. The result was "a maelstrom of contract negotiations, litigation, [and] strike threats" that culminated in passage of the Coal Act. *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 445–46 (2002). The Coal Act created "the UMWA 1992 Benefit Plan to pay health care benefits and collect premiums from former employers and their successors." *Holland v. Bibeau Const. Co.*, 774 F.3d 8, 11 (D.C. Cir. 2014).

The Coal Act provides health benefits to coal industry retirees in three ways. First, it combined two trust funds created by the 1950 and 1974 NBCWAs into a new Combined Fund that offers benefits to eligible beneficiaries who were receiving benefits as of July 20, 1992. 26 U.S.C. § 9703(e). Second, it requires operators still offering independent employer plans to continue doing so. 26 U.S.C. § 9711. Third, it created the 1992 Plan, which provides health care benefits to all eligible beneficiaries not covered by either of the two aforementioned provisions. 26 U.S.C. § 9712(b).

In passing the Coal Act, the Congress found it necessary "to identify persons most responsible for plan liabilities in order to stabilize plan funding." Pub. L. No. 102-486, § 19142, 106 Stat. 2776, 3037 (1992). For the 1992 Plan, those persons the Congress identified as responsible for the financing were primarily operators that had signed the 1988 NBCWA, referred to as LSOs, § 9712(d)(6), and "related persons," such as businesses that were under common control with an LSO as of July 20, 1992. 26 U.S.C. § 9701(c)(2); *Williams Mountain*, 256 F.3d at 821.

The Coal Act requires LSOs to contribute to financing the 1992 Plan in three ways. 26 U.S.C. § 9712(d)(1)(A)–(C). They must: (A) pay a premium for each of their retirees who is enrolled in the 1992 Plan; (B) provide "security (in the form of

a bond, letter of credit, or cash escrow) in an amount equal to a portion" (to be determined by the Trustees) of their retirees' future health care costs; and (C) pay a backstop premium to help cover the cost of providing benefits to orphaned retirees if contributions from the Abandoned Mine Reclamation Fund, 30 U.S.C. § 1232, created in 1977 by the Surface Mining Control and Reclamation Act, Pub. L. No. 95-87, § 401, 91 Stat. 445, 456 (1977), are insufficient to do so. In addition, the Act makes persons related to an LSO "jointly and severally liable . . . for any amount required to be paid . . . under this section." 26 U.S.C. § 9712(d)(4). It is the parties' conflicting interpretations of the last provision that gives rise to this case.

In 1992, Arch Coal owned several coal companies that were LSOs. Arch Coal is therefore a person related to those operators. Accordingly, Arch Coal initially provided security to fulfill its subsidiaries' obligations under § 9712(d)(1)(B). In 2005, Arch Coal sold its LSO subsidiaries to the Magnum Coal Company and, in the course of the transaction, Magnum substituted its own security for that previously provided by Arch. In 2008, the Patriot Coal Corporation acquired Magnum and replaced Magnum's security on behalf of Arch Coal's former subsidiaries by adding Arch Coal's former subsidiaries to a letter of credit previously issued by Fifth Third Bank for the account of Patriot's other LSO subsidiaries. The letter of credit allowed the 1992 Plan to draw down the security if Patriot ceased to provide benefits under § 9711 or if the 1992 Plan later enrolled its retirees. Arch Coal was not a party to the letter of credit.

In May 2015, Patriot and its subsidiaries, including Arch Coal's former subsidiaries, filed for bankruptcy, pursuant to which the Coal Act obligations of Arch Coal's former subsidiaries were terminated in October 2015. That same month, Arch Coal notified the 1992 Plan that, as a related

person, it would provide health care benefits to retirees of its former subsidiaries. In November 2015, Arch Coal began providing benefits to retirees of its former subsidiaries per § 9711, and paying premiums to the 1992 Plan per § 9712(d)(1)(A). It did not, however, provide security pursuant to § 9712(d)(1)(B). In December 2015, the 1992 Plan drew down Patriot's $8,608,392 letter of credit, with which Patriot had fulfilled the obligations to provide security for the benefit of Arch's former subsidiaries.



In March 2016 the 1992 Plan first informed Arch Coal it was obligated as a related person to provide security pursuant to § 9712(d)(1)(B). Arch Coal refused, arguing Patriot's letter of credit not only satisfied its obligation under that provision but in fact over-secured the obligations of Arch Coal's former subsidiaries.

The Trustees of the 1992 Plan sued under the Coal Act and the Employee Retirement Income Security Act (ERISA) to compel Arch Coal to provide security. Arch Coal counterclaimed to recover the $447,672 in excess security provided by the letter of credit.

The district court held that, as a related person, Arch Coal was required to provide the security demanded by the Trustees.

The court reasoned that the cash proceeds the Plan received from Patriot's letter of credit did not satisfy Arch Coal's obligation to provide security because they were not in a form acceptable under the Coal Act, to wit, a bond, a letter of credit, or a cash escrow. Further, the court rejected Arch Coal's alternative contention that the 1992 Plan was obligated to use the proceeds of the letter of credit to provide security on behalf of Arch Coal's former subsidiaries or to provide benefits solely for retirees of those former subsidiaries. The district court therefore granted the Trustees' motion for summary judgment and ordered Arch Coal to provide security pursuant to § 9712(d)(1)(B). Notwithstanding the apparent anomaly of the 1992 Plan receiving security from Arch Coal after drawing down the $8,608,392 from Patriot's letter of credit to cover the very same retirees, we are constrained by the Coal Act to affirm the judgment of the district court.

## II.    Analysis

On appeal, Arch Coal argues first that the Coal Act does not require a related person to provide security to the 1992 Plan. Second, and more narrowly, Arch Coal contends the requirement to provide security was satisfied by the letter of credit provided by Patriot on behalf of Arch Coal's former subsidiaries, with which Arch Coal is jointly liable. More narrowly still, Arch Coal argues the 1992 Plan is required to use the proceeds of Patriot's letter of credit to fund benefits for retirees of Arch Coal's former subsidiaries, thereby relieving Arch Coal of at least some of its obligations under the Coal Act, including the obligation to provide security. Notably, however, Arch Coal does not pursue its counterclaim nor otherwise take issue with the Trustees' decision to draw down the letter of credit.

**A. Obligation of related persons to provide security**

As in any case involving a question of statutory interpretation, "we begin with the language of the statute." *Sigmon Coal*, 534 U.S. at 450. Because Arch Coal agrees it is a person related to an LSO, the question before the court is whether the provision of security in § 9712(d)(1)(B) is included in a related person's joint and several liability for "any amount required to be paid" in § 9712(d)(4). As the term "'any amount required to be paid' is not defined in the Coal Act [it] thus takes on its ordinary meaning." *Holland v. Arch Coal, Inc.*, 346 F. Supp. 3d 99, 105–06 (D.D.C. 2018) (citing *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012)). A plain reading of the Coal Act supports reading each of the three different "financing . . . requirements" detailed in § 9712(d)(1) as an "amount required to be paid" by related persons pursuant to § 9712(d)(4).

The Coal Act imposes three obligations on the companies contributing to the financing of the 1992 Plan, as set out in § 9712(d)(1) and (4) (emphases added):

> **(1) In general**
> All 1988 last signatory operators shall be responsible for financing the benefits described in subsection (c) by meeting the following requirements in accordance with the contribution requirements established in the 1992 UMWA Benefit Plan:
>
> (A) *The payment of a monthly per beneficiary premium* by each 1988 last signatory operator for each eligible beneficiary of such operator who is described in subsection (b)(2) and who

is receiving benefits under the 1992 UMWA Benefit Plan.

(B) *The provision of a security* (in the form of a bond, letter of credit, or cash escrow) in an amount equal to a portion of the projected future cost to the 1992 UMWA Benefit Plan of providing health benefits for eligible and potentially eligible beneficiaries attributable to the 1988 last signatory operator.

(C) If the amounts transferred under subsection (a)(3) are less than the amounts required to be transferred to the 1992 UMWA Benefit Plan under subsections (h) and (i) of section 402 of the Surface Mining Control and Reclamation Act of 1977 (30 U.S.C. 1232), *the payment of an additional backstop premium* by each 1988 last signatory operator which is equal to such operator's share of the amounts required to be so transferred but which were not so transferred, determined on the basis of the number of eligible and potentially eligible beneficiaries attributable to the operator.

. . .

**(4) Joint and several liability**
A 1988 last signatory operator . . . and any related person to any such operator, shall be jointly and severally liable with such operator for *any amount required to be paid* by such operator under this section. The provisions of section 9711(c)(2) shall apply to any last signatory operator described in such section

(without regard to whether security is provided under such section, a payment is made under section 9704(j), or both) and if security meeting the requirements of section 9711(c)(3) is provided, the common parent described in section 9711(c)(2)(B) shall be exclusively responsible for any liability for *premiums* under this section which, but for this sentence, would be required to be paid by the last signatory operator or any related person.

Arch Coal argues § 9712(d)(4) makes related persons liable for payment of premiums under paragraphs (A) and (C) but not for the provision of security under paragraph (B). In drawing this distinction, Arch Coal leans heavily upon the difference between the words "payment" in paragraphs (A) and (C) and "security" in paragraph (B) to argue the "provision of security" is not an "amount required to be paid" within the meaning of § 9712(d)(4). Arch Coal correctly urges the court to consider dictionaries to discern the ordinary meaning of the term "payment," particularly Black's Law Dictionary at 1129 (6th ed. 1990), which defines a payment as "[t]he fulfillment of a promise, or the performance of an agreement" including "a delivery of money or its equivalent." We agree, however, with the district court that the definition of the word "payment" cited by Arch Coal "encompass[es] the provision of security." 346 F. Supp. 3d at 106. As the Trustees point out, liability for "*any* amount required to be paid" plainly includes payments LSOs are required to make to banks to provide security as well as payments made to the 1992 Plan as premiums. *Id*.

Arch Coal cites two prior cases to argue liability under the Coal Act should be interpreted narrowly: *Barnhart v. Sigmon Coal Co.*, 534 U.S. at 450–52, in which the Supreme Court determined the Coal Act imposed liability upon only certain

successors in interest, not all successors in interest; and *Holland v. Williams Mountain*, 256 F.3d at 823, in which we upheld a similarly narrow interpretation of which companies were liable as successors in interest to an LSO.

The Court in *Sigmon Coal*, however, came to its conclusion not by following some principle of narrow interpretation but by a straightforward reading of the statutory text, refusing either to read "differing language" in two subsections as having "the same meaning in each" or to "ascribe the difference to a simple mistake in draftsmanship." 534 U.S. at 452–54. As the Trustees argue, applying the reasoning in *Sigmon Coal* to the portions of the Act at issue here supports reading the term "any amount required to be paid" as imposing upon related persons joint liability for the provision of security as well as for premiums – rather than joint liability for premiums alone. The statute elsewhere refers specifically to liability for premiums and premiums alone, indeed twice, in the section of the Act creating the 1992 Plan: The statute uses the word "premium" in the second sentence of § 9712(d)(4) to refer specifically to liability for premiums, and uses the word "premium" once again in § 9712(d)(3) to impose liability for premiums under § 9712(d)(1)(A) but not for the other obligations in § 9712(d)(1). In contrast to these provisions specifically singling out liability for premiums, the first sentence in § 9712(d)(4) makes related persons jointly liable for "any amount required to be paid." The phrase "any amount required to be paid" is necessarily broader than premiums, and is naturally read to include all the obligations borne by LSOs under § 9712(d)(1), including the provision of security under § 9712(d)(1)(B).

Arch Coal argues the word "premiums" in the second sentence of § 9712(d)(4) cannot inform the meaning of § 9712(d)(1) because it was added by a 2006 amendment to

give a controlled group of companies a way to extinguish certain related person liabilities. But, as the Trustees point out, the argument that a 2006 amendment could not be used to interpret the pre-amendment text impermissibly implies that "the legislature was ignorant of the meaning of the language it employed." *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 186–87 (2004) (plurality opinion) (quoting *Inhabitants of Montclair Twp. v. Ramsdell*, 107 U.S. 147, 152 (1883)). To the extent Arch Coal argues the wording of the original Coal Act is a better guide to interpreting the meaning of the phrase "any amount required to be paid" in § 9712(d)(4), it is worth noting the original text allowed operators to pay "an annual prefunding premium" in lieu of providing security. 26 U.S.C. § 9712(d)(1)(C) (1994). That the original legislation provided a way to satisfy the obligation to provide security with an alternative premium payment would seem to undermine the Company's attempt to differentiate the provision of security in § 9712(d)(1)(B) from the payment of premiums called for in § 9712(d)(1)(A) and (C).

Requiring related persons to provide security is consistent with the purpose and design of the Coal Act to hold coal companies "responsible for financing the benefits" to be provided by the 1992 Plan. 26 U.S.C. § 9712(d)(1). As the district court said and the Trustees reiterated, a statutory provision "must be read in [its] context and with a view to [its] place in the overall statutory scheme." 346 F. Supp. 3d at 107 (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989)). The scheme of the Coal Act places upon LSOs responsibility for financing the 1992 Plan in three ways and holds persons related to an LSO responsible for "any amount required to be paid" under that scheme. Arch Coal's interpretation of the Act instead would make one of those three requirements into an exception that is neither express in the text nor consistent with the rest of the Act.

Arch Coal also argues that reading the Coal Act to require related persons to provide security would be "surplusage," by which it means duplicative, because the original LSO already would have provided the security. That might be so if the provision of security were a one-time obligation meant to cushion the blow to the 1992 Plan when an operator goes out of business without a related person to step in and provide benefits. In fact, however, the obligation is a continuing one. As the Trustees explain, LSOs are required to meet this obligation "in accordance with the contribution requirements established in the 1992 UMWA Benefit Plan," that is, the trust document created to govern the 1992 Plan. 26 U.S.C. § 9712(d)(1). That document sets the amount of security that must be provided each year under § 9712(d)(1)(B) at the projected cost of providing one year of health benefits for all beneficiaries attributable to a particular operator. Because the cost of health care and the number of beneficiaries change over time, the amount of security required is updated annually. Given the nature of this requirement, the provision of some amount of security by an LSO at one time does not satisfy the continuing requirement for a successor LSO or its related person to provide an amount of security that changes each year.

Arch Coal's interpretation would extinguish the liability for related persons to provide security once a predecessor LSO or another related person has done so. As the Trustees point out, that would be in tension with §§ 9711(c)(2) and 9712(d)(4) of the Coal Act, in which the Congress expressly allowed related persons to extinguish some of their Coal Act liabilities by providing additional security. 26 U.S.C. § 9711(c)(2) (allowing LSOs and related persons that provide additional security to make "the common parent of the controlled group of corporations . . . (and no other person) . . . liable for the

provision of health care under" § 9711); *id.* § 9712(d)(4) (allowing LSOs and related persons that provide the required security to make their "common parent . . . exclusively responsible for any liability for premiums under this section which" would otherwise be paid by the LSO or any related person).  Section 9712(d)(1)(B), in contrast, does not include an express allowance for an LSO or a related person to extinguish its liability in exchange for the provision of security.  Arch Coal's interpretation would treat a related person's liability under § 9712(d)(1)(B) the same as a related person's liabilities under the provisions that extinguish related person liability, despite the difference between the wording of § 9712(d)(1)(B) and of §§ 9711(c)(2) and 9712(d)(4).  We will not "ascribe this difference to a simple mistake in draftsmanship" rather than to a difference in the intended effect. *Sigmon Coal*, 534 U.S. at 454.

Although the term "any amount required to be paid" is not defined, the term is used again in § 9721, which provides for enforcement of any claim "arising out of an obligation to pay any amount required to be paid" under the Coal Act.  26 U.S.C. § 9721.  Arch Coal claims this wording is merely the product of "parallelism."  As the Trustees point out, interpreting the provision of security under § 9712(d)(1)(B) as something other than an "amount required to be paid," as Arch Coal urges, would leave the 1992 Plan without any way to enforce the requirement for LSOs to provide security.  Giving the 1992 Plan the authority to enforce two contribution requirements under § 9712(d)(1) but not the third is just the type of absurd result courts should avoid.  *See Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1068 (D.C. Cir. 1998) (applying the canon against absurd results if a "result is contrary to common sense").

For the foregoing reasons, we hold the Coal Act unambiguously requires persons related to an LSO, such as Arch Coal, to provide security in accordance with § 9712(d)(1)(B).

### B. Proceeds of the letter of credit as security

Arch Coal argues that, even if it is obligated to provide security as a related person, that requirement was met in 2008 through 2015, when Patriot last updated the letter of credit provided on behalf of Arch's former subsidiaries. As the Trustees argue and the district court held, however, that letter of credit is no longer in force and the proceeds that the Trustees drew from it do not satisfy the requirement that Arch Coal provide security in one of the three ways allowed by the statute – a bond, a letter of credit, or a cash escrow. 26 U.S.C. § 9712(d)(1); 346 F. Supp. 3d at 108. In addition, the Act requires Arch Coal to make contributions in accord with the 1992 Plan requirements, which lay out specific terms for each of the types of security allowed by the statute, and are likewise not satisfied by the proceeds from Patriot's letter of credit. 26 U.S.C. § 9712(d)(1). Arch Coal is foreclosed from arguing the 1992 Plan should have left Patriot's letter of credit to serve as security because Arch Coal does not contest the Plan's decision to draw down Patriot's letter of credit. *See Arch Coal*, 346 F. Supp. 3d at 108. Patriot's letter of credit is no longer providing security; therefore Arch Coal must replace it.

Finally, Arch Coal argues the Trustees are demanding it provide a "duplicate" provision of security because Arch Coal's liability is joint with that of its former subsidiaries and was already satisfied on their behalf by Patriot. According to Arch Coal, this means that if an obligation has been satisfied by or on behalf of one of the jointly liable parties, then it cannot

be demanded from another. *See, e.g.*, *Kaplowitz v. Kay*, 70 F.2d 782 (D.C. Cir. 1934).

As the Trustees pointed out at oral argument, however, the "unusual scenario" in this case is "one of Arch's own making." When a related person is stepping in to meet the Coal Act obligations of an LSO, the related person ordinarily will at the same time "arrange to either replace or take over the existing security" provided by or for that LSO. Arch Coal was familiar with the process by which one company steps in to take over the provision of security from another company; when Magnum bought Arch Coal's subsidiaries in 2005, Magnum replaced Arch's letter of credit with its own. *Arch Coal*, 346 F. Supp. 3d at 103. Beginning on November 1, 2015, when Arch Coal stepped in to provide retiree benefits on behalf of its former subsidiaries, it could have, at the same time, either engaged with Patriot about taking over Patriot's letter of credit or provided its own, but Arch Coal did neither at that time and for more than a month thereafter. *Id.* at 104. Only on December 10 did the Trustees act to draw down Patriot's letter of credit. *Id.* They were not obligated to forego the proceeds from a letter of credit simply because of the possibility another related person would fulfill the obligation to provide security at some point in the future.

### C.  Use of the proceeds of the letter of credit

Lastly, Arch Coal argues the Trustees must use the proceeds from drawing down Patriot's letter of credit to provide benefits to Arch's retirees rather than treat the proceeds as a general asset of the Plan. The Company points out that the security required of an LSO is "an amount equal to a portion of the projected future cost to the 1992" Plan of providing benefits "for eligible and potentially eligible beneficiaries attributable to" that operator.  § 9712(d)(1)(B).  Arch Coal argues this

clause suggests the proceeds from the security should be used for the provision of benefits to that operator's attributable retirees.

We agree with the Trustees and the district court that § 9712(d)(1)(B) provides only the basis upon which to determine the amount of security required; it is not a limit upon the use of the proceeds from that security. 346 F. Supp. 3d at 108 (citing *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 261 (1993) ("[V]ague notions of a statute's 'basic purpose' are . . . inadequate to overcome the words of its text.")). Moreover, we note the phrase in § 9712(d)(1)(B) to which Arch Coal points as providing a limited purpose for the use of the proceeds tracks the phrase apportioning liability for backstop premiums in the neighboring paragraph, § 9712(d)(1)(C) (setting the amount of backstop premiums to be paid based upon "each operator's share . . . determined on the basis of the number of eligible and potentially eligible beneficiaries attributable to the operator"). The backstop premiums are provided to fund benefits for orphaned retirees, "for whom no monthly per beneficiary premium is paid." § 9712(a)(3)(B). This suggests that in both paragraphs the Congress used the number of "eligible and potentially eligible beneficiaries" as a way to apportion liability for premiums among LSOs, not as a way to limit the use of those funds.

We also agree with the district court and the Trustees that, to the extent the use of the proceeds of Patriot's letter of credit are limited, it is by "the fiduciary obligations ERISA imposes" upon the Trustees of the 1992 Plan. *Arch Coal*, 346 F. Supp. 3d at 108 (describing the 1992 Plan as "an employee welfare benefit plan" under 29 U.S.C. § 1002(1) and "a multiemployer plan" under 29 U.S.C. § 1002(37)). Under ERISA, the Trustees have a fiduciary obligation to act "solely in the interest" of the plan beneficiaries, "for the exclusive purpose"

of "providing benefits" and "defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1). Arch Coal argues the proceeds of Patriot's letter of credit should be used either to satisfy its requirement to provide security – an argument we have already dispatched – or to fund benefits for retirees of Arch Coal's former subsidiaries, in either case serving to reduce Arch Coal's obligations as a related person. Again, however, as the Trustees argue and the district court held, for the 1992 Plan to dedicate the proceeds of Patriot's letter of credit in this way would run afoul of the clear injunction in ERISA that the "assets of a plan shall never inure to the benefit of any employer." 29 U.S.C. § 1103(c)(1). Nothing in the Coal Act, therefore, requires the 1992 Plan to set aside the proceeds of Patriot's letter of credit for the sole benefit of the retirees attributable to Arch Coal's former subsidiaries.

Arch Coal argues that because the 1992 Plan document itself allows the drawdown of security "in the event that [an LSO] fails to meet its obligation to provide benefits required under section 9711," the proceeds of Patriot's letter of credit cannot become assets of the 1992 Plan before the Plan steps in to provide benefits to Arch Coal's retirees. Read straightforwardly, however, the 1992 Plan does not restrict the use of the proceeds of the security, but instead restricts the circumstances in which the 1992 Plan may draw upon the security. And, to reiterate, the 1992 Plan's drawdown of Patriot's letter of credit was in accordance with the terms of the letter of credit and is not challenged by Arch Coal. *Arch Coal,* 346 F. Supp. 3d at 108.

## III.    Conclusion

We acknowledge that the 1992 Plan has received what the district court termed a "windfall" by drawing down Patriot's

letter of credit only to have Arch Coal provide additional security. 346 F. Supp. 3d at 109. As a person related to LSOs, however, Arch Coal was required to provide security regardless whether the proceeds of Patriot's letter of credit were paid to the 1992 Plan. To the extent Arch Coal could have used Patriot's letter of credit to fulfill that obligation it was Arch Coal's own failure to provide for a transition of the security when it provided for the transition of health benefits that precludes its doing so now.

For the reasons set out above, the order of the district court granting summary judgment for the Trustees of the 1992 Plan is

*Affirmed*.